IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RAMON ALVARADO, JAVIER ALVARADO, RICARDO ALVARADO, JAIME BANUELOS, ARTURO BANUELOS, RUBEN BANUELOS, IGNACIO JAVIAN, JOSE LARIOS, PEDRO CASTRO, ABEL CASTRO, TAURINO GUZMAN, HENRY MARTINEZ, LUCIO POLANCO, SERGIO POLANCO, JUAN POLANCO, FERNANDO CASTRO, HORACIO CASTRO, ERICK RAMIREZ, JOSE VALDEZ, ANTONIO GUZMAN, FRANCISCO GUZMAN, CARLOS BANUELOS, FELIPE BERUMEN, and JOSE GARCIA<br><br>Plaintiffs,<br>v.<br>CORPORATE CLEANING SERVICE, INC., and NEAL ZUCKER, individually,<br><br>Defendants. | No. 07 C 6361<br><br>Judge Robert M. Dow<br><br>Magistrate Judge Nan R. Nolan |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO COMPEL
ANSWERS TO PLAINTIFFS' FIRST DOCUMENT REQUESTS**

Defendants Corporate Cleaning Services, Inc. and Neal Zucker (collectively "CCS") respond as follows to Plaintiffs' Motion to Compel:

**I.   Introduction**

On July 21, 2008 this Court entered an order bifurcating discovery in this case, so that discovery would be limited at this time to "the issue of the 'commission exemption'" and not extend to issues of general liability or Plaintiffs' damages.[1] Plaintiffs concede that the Court's Order does not permit discovery on damages or general liability at this stage. Nevertheless, Plaintiffs' document requests do not seek any information relevant to the commission exemption. Instead, the requested information could relate only to damages or general liability. Because

---

[1] See Minute Entry, July 21, 2008, Dckt #23, ("Order").

Plaintiffs seek documents beyond the permissible scope of discovery established by the Order and because the requests are unduly burdensome, CCS objected to the discovery. CCS' objections are perfectly appropriate and should be sustained.

Moreover, even if this Court were inclined to generally permit discovery beyond the commission exemption (and it should not given that CCS intends to file a summary judgment motion based on the commission exemption which, if granted, would obviate the need for additional discovery), this Court should still deny the requested discovery. Plaintiffs' stated reason for needing this information is baseless—i.e., to evaluate the merits of CCS' commission exemption defense. CCS has already provided Plaintiffs with significant amounts of discovery to make this determination.

Specifically, CCS has responded to and given supplemental responses to two sets of interrogatories and production requests. CCS has also produced over 3200 pages of documents and two discs of electronic information relating to Plaintiffs' claims. Those documents include the employee files and W-2's for each Plaintiff, collective bargaining agreements with Plaintiffs' union, Plaintiffs' union grievances, weekly payroll registers for each Plaintiff for 2004, 2005, 2006 and 2007, and daily Employee Assignment Reports to track scheduling and work orders for 2006 and 2007. In electronic format CCS has also produced weekly "Points Entered Reports" for all jobs completed by Plaintiffs for the period November 2004 through November 2007 as well as weekly hours worked and compensation paid to each Plaintiff for 2008. CCS has also responded to specific follow up inquiries from Plaintiffs' counsel regarding CCS' compensation system, provided supplemental information as to how CCS' customers are charged for services, and responded to Plaintiff Henry Martinez's second set of interrogatories and production requests as to how Plaintiffs' compensation was calculated. As discussed more fully below, the

requested discovery is duplicative, unduly burdensome, not necessary for resolution of the commission exemption and should be denied.

## II.　The Section 7(i) Commission Exemption

To establish the Section 7(i) commission exemption—the only issue that is relevant at this stage of the litigation—CCS will have to show that Plaintiffs (1) earn at least $7.73 (one and one half times the federal minimum wage); (2) earn more than half their salary in commissions for a representative period not less than one month; and (3) work for a retail or service establishment.[2] Section 7(i) does not define the term "retail or service establishment." Instead, courts apply the definition in a now repealed FLSA provision, §13(a)(2). Section 13(a)(2) defined a "retail or service establishment" as: (1) "an establishment 75 percentum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and [2] is recognized as retail sales or services in the particular industry."[3] In <u>Idaho Sheet Metal Works, Inc. v. Wirtz</u>, the Supreme Court held that the meaning of "retail" is to be determined by the courts, not by the defendant or the defendant's industry.[4] Thus, any discovery Plaintiffs seek must bear on these issues.

Plaintiffs' motion suggests that a business may not be considered "retail" under the commission exemption if it provides services pursuant to ongoing contracts or to commercial customers rather than to individual consumers. However, this notion was specifically rejected by Congress in 1949 and, subsequently, by the United States Supreme Court, federal district courts

---

[2]　See 29 U.S.C. § 207(i); 29 C.F.R. §§ 779.410 et seq.; <u>Yi v. Sterling Collision Centers, Inc.</u>, 480 F.3d 505, 506 (7th Cir. 2007).

[3]　29 U.S.C. §213(a)(2).

[4]　383 U.S. 190, 204-05 (1966).

and opinions of the Department of Labor.[5] Thus, for purposes of the "retail" element of the commission exemption, it makes little difference whether CCS sells its window washing services primarily to commercial customers or pursuant to ongoing contracts.[6]

### III.  Documents Subject to Plaintiffs' Motion to Compel

#### 1.  Reproduction of "Points Entered Reports" in Access Format (Request No. 6)

Plaintiffs seek to compel CCS to reproduce as Access files "Points Entered Reports" which CCS already produced to Plaintiffs in electronic RTF format. CCS produced the "Points Entered Reports" as RTF files in response to Plaintiffs requests for information relating to the hours Plaintiffs worked and the compensation Plaintiffs' earned.[7] In particular, Request 6 of Plaintiffs' First Request For Production of Documents to Defendants asks for:

> [a]ll timesheets, schedules, time stamped documents (including but not limited to security logs, computer logs, and phone logs) and other documents that provide an identifiable time for work-related activity by Plaintiffs or other documents

---

[5] See e.g., Mitchell v. Kentucky Finance Co., 359 U.S. 290, 294-294 (1959) ("Congress . . . passed the 1949 amendment to §13(a)(2) to do away with the rule that sales to other than individual consumers could not qualify as retail in deciding whether a particular business enterprise was a 'retail or service' establishment,' and to substitute a more flexible test, under which selling transactions would qualify as retail if they (1) did not involve 'resale,' and (2) were recognized in the particular industry as retail."); Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 203 (1966) ("Congress also intended that the retail exemption extend in some measure beyond consumer goods and services to embrace certain products almost never purchased for family or noncommercial use."); Collins v. Horizon Training Centers, No. 3:02CV1310-L, 2003 WL 22388448, *7 (N.D. Tex. 2003) (Employer "can qualify as a 'retail or service establishment' [under Section 7(i)] even if most of its customers are businesses, if its sales are not for resale and are recognized in the industry as retail."); Schwind v. EW & Assocs., 371 F. Supp. 2d 50, 566-567 (S.D. N.Y. 2005) (computer software companies services exclusively tailored and sold to businesses considered "retail" under the Section 7(i) exemption) English v. Ecolab, No. 06-Civ. 5672(PAC), 2008 WL 878456, *13- *14 (S.D. N.Y. March 31, 2008) ("The simple fact that the services provided by Ecolab were sold to business customers and not to households does not place Ecolab outside the scope of the §7(i) exemption. . . . So long as the employee meets the other elements of the §7(i) exemption—he receives commissions and his total wages meet the statutory threshold—it makes little difference whether he performs his services as part of a bulk, discount arrangement with a thousand unit fast food chain or a single one-off sale to a homeowner."), DOL Opinion Letter, 1982 DOLWH LEXIS 40 (July 14, 1982) (recognizing pest control services performed for both residential and commercial customers as retail even when performed under maintenance contracts of a year or more).

[6] For purposes of its motion for summary judgment, CCS will stipulate that more than 95% of its services are performed for commercial customers—i.e., businesses, property management firms and condominiums—rather than for individual private households and that a majority of CCS' sales are derived from ongoing service contracts.

[7] An example of the "Points Entered Reports" produced as RTF files is printed out, marked as Exhibit A, and filed under seal.

identifying or describing the time worked by Plaintiffs. (*Plaintiffs request these documents be produced in electronic and importable form where available*). (emphasis added).

CCS has provided Plaintiffs everything they have requested, which relates to the commission exemption, in electronic format as RTF files. RTF files are electronic and importable, and thus, comply with Plaintiffs' Request. In addition, RTF format is appropriate in this case because discovery is limited to the commission exemption and damages are not an issue at this juncture of the litigation. Given the limits on discovery, the RTF format is useable for Plaintiffs' needs.

Plaintiffs' purported reasons for needing the same information in Access format is to: (1) identify CCS' customers and (2) determine the wages paid to Plaintiffs for each job. They say the RTF format is not useable because they cannot perform mathematical computations without re-entering the information in by hand. However, the RTF files already identify CCS' customers.[8] The same information in Access format would not provide any additional information concerning the identity of Plaintiffs' customers. Likewise, the RTF files clearly show the "points" allocated to each Plaintiff for each job on a weekly basis. Each Plaintiff's weekly compensation is based upon the number of "points" assigned to him for the jobs he worked that week. Because the Plaintiffs were paid their union rate of $16.00 or more per "point", the first element of the commission exemption—i.e., that Plaintiffs were paid at least $7.73 per hour—is easily satisfied.[9] Plaintiffs do not need to run complicated mathematical

---

[8] See, e.g., Exhibit A.

[9] To Defendants' knowledge, the individual Plaintiffs would not dispute that they were regularly paid their union rate or more for every hour worked. In fact, the documents produced to date show that in most instances Plaintiffs were paid nearly twice their union rate, or $32.00 per hour, which is well in excess of $7.73 (time and a half of minimum wage). See Payroll Worksheet for Week Ending 8/11/2008, marked as Exhibit B and filed under seal (showing F. Castro was paid $30.94/hour, P. Castro was paid $33.62 per hour, J. Garcia was paid $15.11 per

computations to determine whether they were paid at least $7.73 per hour. Thus, Plaintiffs do not need the "Points Entered Reports" reproduced in Access format for purposes of the commission exemption.

Moreover, Plaintiffs' request that the "Points Entered Reports" be provided in another format would be unduly burdensome and unnecessary. In fact, Fed.R.Civ.P. 34 (b)(2)(E)(iii) specifically states that "[a] party need not produce the same electronically stored information in more than one form." Thus CCS' discovery response complies fully with Plaintiffs' request and with Fed.R.Civ.P. 34(b).

### 2. 2008 Daily Timesheets (Requests Nos. 2 and 6)

Plaintiffs' motion also seeks to compel CCS to produce Plaintiffs' daily timesheets for the period January through August 2008. As an initial matter, CCS has already produced in electronic format (as Excel files) its time records for the requested timeframe. Because Plaintiffs already have the information they request in electronic format, requiring CCS to produce daily timesheets stored on paper would be unnecessarily cumulative and duplicative. Further, Plaintiffs' request for the paper records is unduly burdensome, and that burden substantially outweighs Plaintiffs' need, if any, to obtain the information. Plaintiffs are required to submit a timesheet each day. Assuming Plaintiffs worked five days a week for each of the 32 weeks in the requested time period, each Plaintiff would have submitted 160 timesheets. Multiplying 160 timesheets by sixteen (the number of Plaintiffs employed by CCS in January 2008) amounts to 2560 timesheets.[10] Requiring CCS to produce approximately 2000 timesheets—when the same

---

hour, H. Martinez was paid $32.21 per hour, J. Polanco was paid $32.77 per hour, L. Polanco was paid $36.76 per hour, S. Polanco was paid $44.85 per hour).

[10] As of August 2008, only seven Plaintiffs remained employed with the Company. Thus, the number of timesheets subject to Plaintiffs' request is between 1120 and 2560.

information has already been produced electronically—is unduly burdensome. More importantly, Plaintiffs' stated reason for needing the records is baseless—i.e., to determine whether Plaintiffs were paid $7.73 per hour. As noted above, CCS has already provided Plaintiffs with significant amounts of information to make this determination. The records provided to date indicate that Plaintiffs were paid three to five times the federal minimum wage.[11] Plaintiffs' request for daily time sheets stored on paper should be denied because the same information has already been produced in electronic format and, in any event, is not necessary for the resolution of the commission exemption.

### 3. CCS' Customer Information (Requests Nos. 32 and 33)

Plaintiffs' Requests 32 and 33 ask for all invoices, contracts and other documents identifying CCS' customers, the amounts CCS' customers were charged, the amounts they paid, and the method of payment from November 2004 through present. Plaintiffs have since offered to limit their requests to the months June, July and August in the years 2004, 2005, 2006 and 2007. Plaintiffs' stated reason for needing these materials is to determine whether Plaintiffs were paid on a commission basis—i.e., whether Plaintiffs were paid a percentage of the price charged to CCS' customers.

In response to the requests, CCS described in great detail the method it uses to calculate Plaintiffs' compensation and how Plaintiffs' compensation is based upon the price CCS charges its customers. In particular, CCS answered:

> Prior to December 4, 2007, all window washers were compensated based upon the "assigned hours" charged to a client and allocated to the window washer. As stated above, an "assigned hour" is not an actual clock hour and does not correspond to the time actually worked. This compensation system is described more fully below.

---

[11] See footnote 9 herein; Exhibit B.

Since the December 4, 2007 pay period, window washers have been compensated on either (a) an hourly basis; or (b) based upon the "points" charged to a client. All Plaintiffs (whether paid hourly or based upon "assigned hours" or "points") have been classified as "A Card" during the time period relevant to the Amended Complaint. Pursuant to negotiations with the window washers' union, "A Card" window washers compensated on an <u>hourly basis</u> received $16.60 per hour from December 4, 2007 until December 31, 2007 and $17.25 per hour as of January 1, 2008 for the first forty hours worked in a workweek, and time and one half for all hours worked in excess of forty in a workweek.

Under the "points" and "assigned hour" systems, "points" are essentially the same as "assigned hours"; the only difference being a change in terminology to avoid confusion and to clarify that "assigned hours" are not—and have never been—actual hours worked. Window washers compensated under these plans get so much per "point" for the work they perform. A window washer compensated under these plans may work only 5, 6, or 7 hours a day and still receive credit for 8, 9, or 10 "points" depending upon how much work he has done. Each job is assigned a certain number of "points" for which the customer is charged, regardless of the actual time it takes to perform the job. The number of "points" assigned to a job depends upon the complexity of the job and how much work the Company estimates is involved. Those "points" are then multiplied by a cost rate to calculate the amount charged to the customer. The number of "points" charged to a customer equals the number of "points" allocated to the window washers. For example, if a customer is charged 40 hours for a job, all 40 hours are allocated to the window washer(s) who complete that job.

Each window washer's allocated share of "points" (or "assigned hours") is then multiplied by his union rate to compute his pay. From November 8, 2004 to January 1, 2007, the union rate for "A Card" window washers was $16.00 per "assigned hour". From January 1, 2007 until December 31, 2007 it was $16.60 per "point" (or "assigned hour"). Since January 1, 2008, it has been $17.25 per "point." Thus, if an A Card window washer is allocated 50 "points" for a week's work in 2008, his pay for that week would be 50 times his union rate (e.g., 50 x $17.25 or $862.50). Accordingly, his pay is directly related to the amount charged the client and not the amount of hours he actually worked.[12]

CCS also responded to Plaintiff Henry Martinez's Second Set of Interrogatories and Production Requests, producing documentation and further describing how Plaintiffs' compensation is calculated based upon the "points" charged to CCS' customers:

---

[12] See Defendants' First Supplemental Answers to Plaintiffs' First Set of Interrogatories, Supplemental Answer to Int. No. 6, par. 2, attached hereto as <u>Exhibit C</u>.

**INTERROGATORY NO. 1**

With respect to the compensation paid to Plaintiff Henry Martinez for the pay period between August 5, 2008 and August 11, 2008 and identified on the Earnings statement attached hereto, state the following:

a.  Whether Plaintiff Henry Martinez was compensated on an hourly basis or based upon the "points" charged to clients during that work week;

b.  The amount of time Plaintiff Henry Martinez worked in that pay period;

c.  The number of hours Defendants deducted from the amount of time Plaintiff Henry Martinez worked in that pay period and an explanation for why any such deduction was taken from the amount of time Henry Martinez worked;

d.  The number of "assigned hours" or "points" Plaintiff Henry Martinez worked in that pay period;

e.  Explain why Henry Martinez is compensated for 8.50 hours of overtime in that pay period;

f.  Explain why Henry Martinez is compensated a "bonus1" in the amount of $668.44, including how that "bonus1" compensation was calculated in that pay period.

**ANSWER:**

a.      For the pay period between August 5, 2008 and August 11, 2008 Mr. Martinez was compensated based upon the "points" charged to clients for the jobs Mr. Martinez worked on during that week. Specifically, Mr. Martinez earned 91.50 points that week. (See "Points Entered Report-By Name and Payroll Date" and underlying documents, CCS 03273-03281).

b.      Mr. Martinez completed Timesheets showing that he worked 49 hours during the pay period between August 5, 2008 and August 11, 2008. Answering further, Defendants state that the Earnings Statement for that week as well as CCS' payroll documents mistakenly listed Mr. Martinez's reported time worked as 48.5 hours rather than as 49 hours. This was due to an error in adding Martinez's reported time for August 6, 2008 as 10.5 hours rather than as 11 hours. (See "Hours Worked Report – By Payroll Date" and "Timesheets", CCS 03267-03272).

c.      Defendants object to this interrogatory as vague and confusing. Subject to the foregoing objections, Defendants did not "deduct" any time Plaintiff Henry Martinez worked during the pay period between August 5, 2008 and August 11, 2008. Answering further, Defendants state that all window washers, including Plaintiff Henry Martinez, are instructed to take a thirty minute unpaid break each day. Although the window washers take a daily break, they do not record their break time on their Timesheets. Pursuant to the union contract, window washers are not required to record their break time on the Timesheet. To

account for the window washer's unpaid lunch break, CCS subtracts thirty minutes from the total time recorded on each daily Timesheet. This lunch break time is not time "worked" and is not compensated.

   d.  Defendants object to this interrogatory as vague and confusing. Subject to the foregoing objections, Defendants state that Mr. Martinez earned 91.5 "points" and recorded 49 hours worked during the pay period between August 5, 2008 and August 11, 2008.

   e.  Mr. Martinez's compensation for the pay period between August 5, 2008 and August 11, 2008 was based upon the "points" he earned for the work he performed during that week. Specifically, Mr. Martinez earned 91.50 points, multiplied by his union rate of $17.25 per point, equals $1578.375. His compensation for the week was $1578.38. In response to an investigation by the Illinois Department of Labor, CCS began recording the number of hours actually worked by each window washer each week. Thus, for record keeping purposes, Mr. Martinez's check shows the number of hours he worked and the amount he would have been paid on an hourly basis for those hours. (In this case, Mr. Martinez's Earnings Statement reflects that he worked 48.5 hours, including 40 hours at $17.25 totaling $690 and 8.5 hours at $25.875 totaling $219.94). However, Mr. Martinez compensation was based upon the "points" he earned, not upon the hours he worked.

   f.  Mr. Martinez earned $1578.38 under the points system for the pay period between August 5, 2008 and August 11, 2008. For record keeping purposes, CCS records the amount Mr. Martinez would have been paid under the hourly system (in this case $909.94). That amount is then subtracted from the amount Mr. Martinez actually earned for the week under the points system. The resulting number is listed as "bonus 1." (In this case, $909.94 is subtracted from $1578.38. Mr. Martinez's "bonus 1" for the week is $668.44.)[13]

Additionally, CCS produced documents identifying its customers and describing the window washing services provided to each customer for each job.[14] CCS objected, however, to producing its customer contracts, invoices and proposals because the requested documents would not provide any information relevant to the commission exemption and the burden of producing such vast amounts of information significantly outweighs any need for this information at this stage of the case. Specifically, the requested documents will not shed any light on whether

---

[13] See Defendants' Answers to Plaintiff Henry Martinez's Second Set of Interrogatories, attached hereto as Exhibit D.

[14] See, for example, Exhibit A.

Plaintiffs were paid on a commission basis—the only element of the commission exemption that Plaintiffs argue the disputed discovery relates to.[15] To illustrate this point, CCS has marked as Exhibit E and filed under seal, exemplar copies of a customer contract, invoice and proposal. These documents do not provide any information as to whether the Plaintiffs were paid on a commission basis.

Discovery is limited to "matter that is relevant to any party's claim or defense" but "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."). Fed.R.Civ.P. 26(b)(1). Thus, if the information sought is not relevant, it is not discoverable. Id. Plaintiffs have not established how CCS' customer contracts, invoices or proposals are relevant to the proof of the commission exemption. In addition, the burden of producing the requested information significantly outweighs any need for this information at this stage of the case. Even if the requests are limited to June, July and August for 2004, 2005, 2006 and 2007 (twelve months) the burden to CCS to produce such information is too great. CCS washes windows in over 1000 buildings for more than 700 customers. CCS provides proposals to and enters into Service Contracts with the vast majority of its customers. On average, CCS washes windows in approximately 310 buildings and issues 220 customer invoices *each month*. Thus, even limiting Plaintiffs request to a twelve month period, the requested documents would exceed several thousand pages. Because CCS' customer contracts, invoices and proposals will not provide additional information relevant to the commission exemption and would be unduly burdensome to produce, Plaintiffs' motion to compel these records should be denied.

---

[15] To the extent Plaintiffs motion suggests that CCS' customer contracts, invoices and proposals may show whether CCS' business is "retail" in nature, the request should still be denied. What is relevant to the "retail" element of the exemption —which the customer invoices, proposals and contracts will shed no light on—is whether CCS' window washing services are "for resale" and whether window washing services are considered "retail." If Plaintiffs are permitted to scour these materials, this still would not prove either part of the "retail" element. See Exhibit E.

## IV.    Conclusion

Putting aside the fact that Plaintiffs' requests seek documents that are irrelevant to the commission exemption, Plaintiffs' motion to compel should be denied because CCS has given Plaintiffs virtually everything that they ask for. Indeed, as demonstrated above, CCS provided the "Points Entered Reports" in RTF format which is electronic, importable and useable for determining whether Plaintiffs were paid $7.73 per hour under the commission exemption. CCS also provided Plaintiffs' time records for 2008 in electronic (Excel) format. CCS also fully explained in interrogatory answers how its customers are charged and how Plaintiffs' compensation is calculated based upon that charge. Likewise, CCS provided documents identifying its customers and the "points" allocated to each Plaintiff each week for each job (which forms the basis of Plaintiffs' compensation). The requested customer contracts, invoices and proposals will not provide additional information relevant to the commission exemption.

In light of the Court imposed limitation on discovery, CCS' responses are perfectly appropriate. Plaintiffs have more than adequate information to determine whether they were paid $7.73 per hour, whether Plaintiffs' compensation is commission based and whether CCS's business is "retail" in nature. Plaintiffs should be required to focus their energy and resources on information relating to the "commission exemption", so this matter can be promptly resolved. For the foregoing reasons, Plaintiffs motion to compel should be denied.

Date:   September 16, 2008                                Respectfully submitted,

Ira M. Levin                                              /s/ Christina Y. Nelson
Martin K. LaPointe                                        Attorneys for Defendants
Christina Y. Nelson
Burke, Warren, MacKay & Serritella, P.C.
330 North Wabash Avenue – 22nd Floor
Chicago, Illinois 60611
Tel: 312-840-7050