**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RAMON ALVARADO, JAVIER ALVARADO, RICARDO ALVARADO, JAIME BANUELOS, ARTURO BANUELOS, RUBEN BANUELOS, IGNACIO JAVIAN, JOSE LARIOS, PEDRO CASTRO, ABEL CASTRO, TAURINO GUZMAN, HENRY MARTINEZ, LUCIO POLANCO, SERGIO POLANCO, JUAN POLANCO, FERNANDO CASTRO, HORACIO CASTRO, ERICK RAMIREZ, JOSE VALDEZ, ANTONIO GUZMAN, FRANCISCO GUZMAN, CARLOS BANUELOS, FELIPE BERUMEN and JOSE GARCIA, | ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 07-cv-6361 |
| | ) | |
| Plaintiffs, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| v. | ) | |
| | ) | |
| CORPORATE CLEANING SERVICE, INC., and NEAL ZUCKER, individually, | ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, twenty-four current and former employees of Defendant Corporate Cleaning Service, Inc. ("CCS"), a window washing business, have filed suit against CCS and its President and Chief Executive Officer, Neal Zucker, seeking overtime pay allegedly due to them under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.* Defendants contend that Plaintiffs are exempt from the overtime provisions of both statutes because they are commissioned employees. Currently before the Court is Defendants' motion for summary judgment [60]. For the reasons stated below, Defendants' motion for summary judgment [60] is denied.

## I.      Background

The Court takes the relevant facts primarily from the parties' Local Rule ("L.R.") 56.1 statements[1]:  Defendants' Statement of Facts ("Def. SOF") [63], Plaintiffs' Response to Defendants' Statement of Facts ("Pl. Resp.") [97], Plaintiffs' Statement of Additional Facts ("Pl. SOF") [98], and Defendants' Response to Plaintiffs' Statement of Additional Facts ("Def. Resp.") [107].[2]

### A.      The Nature of CCS's Business

Defendant CCS has provided professional interior and exterior window washing services to commercial and residential customers in the Chicago area since 1994.  Def. SOF ¶ 6.  CCS's

---

[1] L.R. 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence.  See L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000).  The Seventh Circuit repeatedly has confirmed that a district court has broad discretion to require strict compliance with L.R. 56.1.  See, *e.g., Koszola v. Bd. of Educ. of the City of Chicago,* 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon,* 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)).  Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement.  See, *e.g., Malec,* 191 F.R.D. at 583.  Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted.  See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec,* 191 F.R.D. at 584.  The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted."  *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000).  In addition, the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts.  See, *e.g.*, *Malec,* 191 F.R.D. at 584 (citing *Midwest Imports,* 71 F.3d at 1317).  Similarly, the Court disregards a denial that, although supported by admissible record evidence, does more than negate its opponent's fact statement – that is, it is improper for a party to smuggle new facts into its response to a party's L.R. 56.1 statement of fact.  See, *e.g.*, *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008).

[2] Plaintiffs filed a motion to strike portions of Defendants' statement of facts [95] on the grounds that certain of Defendants' fact statements – and the paragraphs of the Charles E. Adkins and Phillip Kujawa affidavits on which those statements rely – are not supported by admissible record evidence, lack foundation, contradict prior deposition testimony, or are conclusory. Plaintiffs also move to strike the corresponding paragraphs of the Adkins and Kujawa affidavits. The Court agrees with Plaintiffs that a number of Defendants' statements of fact simply recite portions of the relevant federal regulations without providing any evidentiary support.  However, the Court has disregarded any such assertions of fact that lack proper evidentiary support or otherwise violate L.R. 56.1. See *Malec,* 191 F.R.D. at 583-85 (where assertions advanced as proposed statements of material fact are not supported by admissible record evidence, the Court is within its discretion to disregard the statement). Therefore, Plaintiffs' motion to strike [95] is denied as moot.

customers include office and residential high rises, hotels, hospitals, schools and universities, cultural facilities, clubs, shopping centers, and stadiums. Def. SOF ¶ 7. Nearly 100% of CCS's revenues are payments for the window washing services that it provides. Def. SOF ¶ 11.

The majority – perhaps even more than 75% – of CCS's gross sales are attributable to window washing performed on high rise buildings. Def. Resp. ¶ 1. Between 2004 and 2008, approximately 40% of CCS's gross sales were made to commercial customers, consisting almost exclusively of commercial office buildings. Pl. SOF ¶ 3a. In 2006, at least 31.8% of CCS's total gross sales were made to high rise commercial buildings. Pl. SOF ¶ 4. In many cases, professional management companies were invoiced for those jobs. Pl. SOF ¶ 4. In no case were the individual building tenants invoiced.

Between 2004 and 2008, about 39% of CCS's gross sales were made to condominium and apartment buildings. Pl. SOF ¶ 3b. In 2006, at least 32.6% of CCS's total gross sales were made to such residential buildings. Pl. SOF ¶ 5. In most cases, condominium associations or professional management companies were invoiced for those jobs; no individual unit owners or tenants were billed. Pl. SOF ¶ 5. Less that 1% of CCS's gross sales for the years 2004-2008 were made to individual homeowners. Pl. SOF ¶ 3h.

According to Plaintiffs' building management expert, Arthur C. West, tenants in commercial and residential high rises generally are not permitted to hire contractors like CCS to perform building maintenance. Pl. SOF ¶ 18. Rather, according to West, a property management firm or condominium association typically arranges for contractors to perform maintenance work, including window washing. Pl. SOF ¶¶ 10-11. The cost of such work is passed through to tenants or residents in the form of rent, property management fees, or assessments. Pl. SOF ¶¶ 13-14.

In 2006, CCS sold 54% of its window washing services to entities requiring window washing services on more than one building. Pl. SOF ¶ 7.

Before commencing work, CCS generally provides all new customers with a proposal stating the price of the job. Def. Resp. ¶ 16. In some instances, particularly in the case of government contracts, CCS engages in formal, competitive bidding to obtain business. Pl. SOF ¶ 17. Less than 10% of CCS's business is obtained through such formal bidding procedures. Def. Resp. ¶ 17.

### B. CCS's Compensation System

CCS assigns each window washing job a number of "points" based on the complexity of the job and how much work CCS estimates is involved. Def. SOF ¶¶ 27-28. In general, the number of points assigned to a job bears a direct relationship to the number of windows washed. Pl. Resp. ¶ 28. CCS pays its window washers – including Plaintiffs – based on the number of points assigned to each job that they perform. Def. SOF ¶ 19. If one window washer completes a job, that window washer is allocated all of the points for that job. Def. SOF ¶ 33. Where multiple window washers are required to complete a job, the assigned points generally are allocated equally among the window washers. Def. SOF ¶¶ 34-36. To compute an individual window washer's pay, CCS multiplies his allocated number of points by his union rate.[3] Def. SOF ¶ 37.

CCS's window washers are paid based on the number of points assigned to a job, regardless of the amount of time it takes to complete the job. Def. SOF ¶ 42. Therefore, a window washer may work only 5, 6, or 7 hours a day and receive credit for 8, 9, or 10 points. Def. SOF ¶ 41. Conversely, a window washer may work more hours in a day than the number of

---

[3] All of CCS's window washers, including Plaintiffs, are union members. Def. SOF ¶ 25.

points for which he receives credit. Pl. Resp. ¶ 41. The more windows that an employee washes, the more points for which he will be paid. Pl. Resp. ¶ 28.

Plaintiffs do not receive a fixed percentage of the sales price for each job. Pl. SOF ¶ 20. Rather, the percentage of each sale that goes to compensate window washers varies. Pl. SOF ¶ 20. For example, two jobs may have the same sales price of $700, but be assigned different point values. Pl. SOF ¶ 21. As a result, the percentage of the sales price that goes to window washer compensation on each particular job fluctuates. According to CCS's Vice President and Chief Operating Officer, Charles Adkins, CCS's plan is to allocate 48.5% of its net revenue per year to window washer compensation. Def. SOF ¶ 31; Def. Resp. ¶ 20. CCS's billing records indicate that, despite the fact that Plaintiffs do not receive a fixed percentage of the sales price on every job, on average, CCS pays its window washers close to its goal of 48.5% of net revenue per year. For example, in 2005, 45.95% of CCS's net revenue went to window washer compensation. Def. Resp. ¶ 20. That figure was 46.19% in 2006, 47.67% in 2007 and 49.48% in 2008. Def. Resp. ¶ 20.

Under the compensation system described above, Plaintiffs were paid between $32,318 and $50,998 in 2007. Def. SOF ¶ 51. Internal CCS documents refer to the compensation system as a "piece rate" plan. Pl. SOF ¶ 32. No agreement exists between the parties referring to the compensation system as a commission-based plan. Pl. SOF ¶ 31.

### C.    CCS's Billing Practices

Adkins testified that CCS's customers generally are charged a fixed amount for each point assigned to a job, plus the cost of any permits, equipment rentals, and other incidental expenses associated with the particular job.  Def. SOF ¶ 30; Def. Resp. ¶ 26.[4]  CCS foreman Philip Kujawa similarly testified that CCS generally charges that fixed amount per point.  Def. Resp. ¶ 27.  According to Adkins, the fixed charge covers the cost of labor, overhead, and CCS's profit margin.

CCS's billing records demonstrate that customers are rarely charged the exact fixed amount per point.  Pl. SOF ¶ 27.  For example, in 2006, customers were charged exactly that amount per point only 6.99% of the time.  Pl. SOF ¶ 28.  The amount a customer is charged per point can vary widely, from as much as twice the fixed amount to as little as approximately one-fourth of the fixed amount.  Pl. SOF ¶ 21.

Adkins testified that customers are not charged exactly the fixed rate per point on every job as a result of factors such as unpaid debts, competitive market pressures, customer relations, and human error.  Def. Resp. ¶ 20.  Despite these variations, on average, CCS generates an amount equal to approximately the fixed amount in net revenue per point.  Def. Resp. ¶ 20.  For example, in each of the years between 2005 and 2008, CCS's total net revenue divided by total

---

[4] The fixed amount has been provided to Plaintiffs and to the Court under seal and pursuant to a protective order because it constitutes proprietary information that Defendants wish to keep shielded from their competitors.  That information obviously remains part of the record that would be accessible to the court of appeals.  In crafting this opinion, the Court has remained cognizant of the Seventh Circuit's teachings that litigation be conducted as much as possible in public, and that district courts seal from public view "only the *secrets*" themselves, and nothing more.  *Union Oil Co. v. Leavell*, 220 F.3d 562, 567-68 (7th Cir. 2000) (emphasis in original); see also *Solaia Technology LLC v. ArvinMeritor, Inc.*, 2006 WL 695699, at *2 n.5 (N.D. Ill. Mar. 16, 2006) (reading *Union Oil* as "endorsing the practice of issuing opinions that do not disclose information that is appropriately maintained confidential, such as the trade secrets of a party that are the subject of a trade secret dispute").  Consistent with the Court's reading of the pertinent Seventh Circuit guidance, because the exact amount used to calculate the charges to CCS's customers is both confidential and unimportant to the Court's decision or rationale, this opinion refers to a "fixed amount," rather than setting out the amount as a dollar sum.

points paid equaled an amount within 1% of the fixed amount charged per point.  Def. Resp. ¶ 20.

## II.     Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.  See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

### III. Analysis

#### A. The Commission Exemption to the FLSA's Overtime Requirements

The FLSA requires that employees be paid one and one-half times their hourly wage for every hour worked in excess of forty hours per workweek. 29 U.S.C. § 207(a)(1). However, Congress has exempted certain employees from that overtime pay rule, including employees who (i) work in a retail or service establishment, (ii) are paid a wage that exceeds one and one-half times the minimum wage, and (iii) receive more than half of their compensation in the form of "commissions on goods or services."[5] 29 U.S.C. § 207(i). See also *Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 506 (7th Cir. 2007). Here, the parties have stipulated that Plaintiffs are paid a wage that exceeds one and one-half times the minimum wage. They dispute, however, whether CCS's window washing business qualifies as a "retail or service establishment," as well as whether Plaintiffs were paid on a commission basis. Exemptions to the FLSA are to be narrowly construed against the employers seeking to assert them. *Klein v. Rush-Presbyterian St. Luke's Med. Ctr.,* 990 F.2d 279, 282 (7th Cir. 1993). However, that presumed narrow construction is employed only as a "tie-breaker" in extremely close cases. See *Mechmet v. Four Seasons Hotels, Ltd.,* 825 F.2d 1173, 1177 (7th Cir. 1987). Finally, Defendants bear the burden of establishing that Plaintiffs fit within the claimed exemption. *Klein*, 990 F.2d at 283. The Court addresses each of the disputes in turn.

#### B. Retail or Service Establishment

A business qualifies as a "retail or service establishment" if 75 percent of its annual dollar volume of sales of goods or services (or of both) "is not for resale" and "is recognized as

---

[5] The IMWL exempts from overtime provisions "[a]ny commissioned employee as described in paragraph (i) of Section 7 of the Fair Labor Standards Act of 1938 and rules and regulations promulgated thereunder." 820 ILCS 104/4a(2)(F). Therefore, the Court's analysis under the FLSA applies equally to Plaintiffs' IMWL claim.

retail sales or services in the particular industry." See *Gatto v. Mortgage Specialists of Illinois, Inc.*, 442 F. Supp. 2d 529, 537 (N.D. Ill. 2006); 29 C.F.R. §§ 779.411, 779.24.[6] The Department of Labor ("DOL") has promulgated regulations interpreting the term "retail or service establishment." *Gatto*, 442 F. Supp. 2d at 537. Those regulations provide that the two requirements for qualifying as a "retail or service establishment" – (i) 75 percent of annual sales being not for resale and (ii) 75 percent of annual sales being recognized as retail sales – are distinct. See 29 C.F.R. § 779.322 (explaining that "many sales which are not for resale lack a retail concept and the fact that a sale is not for resale cannot establish that it is recognized as retail in a particular industry"). Therefore, the Court will address each requirement in turn.[7]

### 1. Not For Resale

According to the DOL's regulations, a sale of services is for resale "where the seller knows or has reasonable cause to believe will be resold." 29 C.F.R. § 779.334. Plaintiffs argue that the majority of CCS's window washing services are resold from the building managers, management companies, or condominium associations who contract with CCS to the individual

---

[6] The current version of the FLSA does not define "retail or service establishment." *Gatto*, 442 F. Supp. 2d at 537. The definition set forth above appeared in § 213(a)(2) of the statute until that section was repealed in 1989. *Id.* at 538. The section at issue here – § 207(i) – was added to the FLSA in 1961. *Id.* at 537. The legislative history of the 1961 amendment indicates that Congress intended that, for purposes of § 207(i), the term "retail or service establishment" should be defined as set out in § 213(a)(2). *Id.*; see also 29 C.F.R. § 779.24. The Department of Labor ("DOL") promulgated regulations interpreting the term "retail or service establishment" based on the definition in § 213(a)(2). 29 C.F.R. § 779.24. Since Congress repealed § 213(a)(2), the DOL has not adopted revised regulations. *Gatto*, 442 F. Supp. 2d at 538. Courts have held that the definition previously set forth in § 213(a)(2) still applies where the phrase "retail or service establishment" appears elsewhere in the FLSA, including in § 207(i). See *Id.* at 537; *Reich v. Delcorp. Inc.*, 3 F.3d 1181, 1183 (8th Cir. 1993); *Gieg v. DRR, Inc.*, 407 F.3d 1038, 1047 (9th Cir. 2005).

[7] The regulations provide that there is a third requirement for qualifying as a "retail or service establishment" within that term's statutory definition – namely, that a business "must engage in the making of sales of goods or services." 29 C.F.R. § 779.313. Here there is no dispute that CCS sells window washing services.

building tenants who actually pay for the service in the form of rent, property management fees, or assessments.

Defendants respond that the sale of services to building managers and condominium boards cannot be considered for resale because those entities are not middlemen who resell CCS's services, but rather are agents for building tenants and owners.[8] Defendants rely on a line of cases holding that sales in which a third party acts as "a 'conduit' through which funds to the employer-seller flow" are not for resale within the meaning of the statute. *Hodgson v. Ara Services, Inc.*, 392 F. Supp. 1167, 1173 (W.D. Va. 1975); see also *Hodgson v. Prophet Co.*, 472 F.2d 196, 204 (10th Cir. 1972) (where food service company contracted with college to provide food in cafeteria, court concluded that food service company's sales at cafeteria were not for resale, reasoning that "all the college did was to act in the role of a collection agent, rather than a purchaser"); *Wirtz v. Campus Chefs, Inc.*, 303 F. Supp. 1112, 1119 (N.D. Ga. 1968) (sale by food service company that operated dining halls for college were not for resale even though students made payment to the college at registration rather than directly to the defendant food service company). In each of the cases on which Defendants rely, a food service provider contracted with an educational institution to provide meals to students. The students paid the schools for a meal plan, as opposed to paying the food service provider directly for each meal. In each case, the court concluded that, despite the fact that money changed hands between the school and the food service provider *and* between the school and the students, the meals sold by the food service providers were not for resale, reasoning that the schools simply facilitated the exchange

---

[8] Defendants also maintain that they do not sell to building managers because they only get paid if the building owners are satisfied. However, the record evidence indicates that in many cases CCS invoices management companies. Moreover, even if CCS contracted only with building owners, Plaintiffs still would argue that CCS's sales are for resale because the individual unit owners or tenants – not the building owner – are the ultimate consumers, according to Plaintiffs.

between the buyer (the students) and the seller (the caterer). The *Wirtz* court explained its analysis as follows:

> A considerable number of retail sales are made daily where the payment goes to a third party such as American Express, Diner's Club, bank credit plans, private and civic clubs, lease arrangements, salary checkoffs, and the like wherein the seller looks solely to the third party for payment. The retail characteristics of the transaction are not destroyed by such payments nor are such purchases considered for resale merely because the consideration passes through an indirect conduit either before or after the actual transfer. For example, can it be seriously argued that the pre-payment of quarterly civic club dues, including meals, converts the serving of the meal by the hotel or restaurant to the member-consumer into a non-retail transaction? The court thinks not.

303 F. Supp. at 1119.

Defendants contend that the arranging of window washing services by building owners, property management companies, and condominium associations is analogous to the procurement of catering services by schools. The Court agrees. Like the schools in the cases discussed above, the building owners, property management companies, and condominium associations with whom CCS deals arrange for the provision of a service. The building tenants and residents – much like the students in the cases above – pay for that service. The building owners, property management companies, and condominium associations are merely conduits, facilitating the purchase of window washing services by the tenants. Therefore, the Court finds that CCS's sales of services are not for resale.

## 2. Recognized as Retail

CCS also must establish that 75% of its annual sales are of the type that are recognized as retail services in the window washing industry. The DOL regulations describe the characteristics typically associated with a retail or service establishment, including "sell[ing] goods or services to the general public," "serv[ing] the everyday needs of the community in which it is located," being located "at the very end of the stream of distribution," "disposing in small quantities of

[its] products and skills" and "not tak[ing] part in the manufacturing process."[9]   29 C.F.R. § 779.318(a).   See also, *Gatto*, 442 F. Supp. 2d at 540.   CCS appears to satisfy these characteristics.

First, CCS sells its services to the general public.   Plaintiffs disagree, contending that CCS does not sell to the general public because less than 1% of its gross sales are made to individual homeowners.   That argument is unavailing.   As Plaintiffs themselves recognize, Congress amended the FLSA in 1949 to do away with the rule that business-to-business sales could not qualify as retail sales in deciding whether a particular business enterprise was a "retail or service establishment."   *Mitchell v. Kentucky Finance Co.*, 359 U.S. 290, 294 (1959). Therefore, as a number of other district courts have recognized, "[t]he simple fact that the services provided by [an employer] were sold to business customers and not to households does not place [that employer] outside the scope of the § 7(i) exemption."   *English v. Ecolab, Inc.*, 2008 WL 878456, at *13 (S.D.N.Y. March 31, 2008).   See also, *Collins v. Horizon Training Centers, L.P.*, 2003 WL 22388448, at *7 (N.D. Tex. Sept. 30, 2003) (employer "can qualify as a 'retail or service establishment' even if most of its consumers are businesses"); *Schwind v. EW & Associates, Inc.*, 371 F. Supp. 2d 560 (S.D.N.Y. 2005) (finding that firm that provides computer training to commercial businesses is a "retail or service" establishment within the meaning of the exemption).

Moreover, as noted above, the ultimate consumers of CCS's services are the buildings' tenants and residents whose windows CCS washes.   Those businesses and individuals certainly are members of the general public.   See *Wirtz*, 303 F. Supp. at 1118 (reasoning that people

---

[9] As discussed further below, the DOL also provides a partial list of establishments whose goods or services may be recognized as retail, 29 C.F.R. § 779.320, as well as a partial list of establishments lacking a "retail concept," *id.* at § 779.317.   Window washing service providers do not appear on either list.

served in school cafeteria are "the ultimate consumer" and "are part of the general consuming public"). The mere fact that they choose to reside or conduct their business in a high rise does not relegate them to some separate category.

Second, CCS serves the everyday needs of the community. There can be little doubt that members of the public require and demand clean windows in their homes, workplaces, hotel rooms, hospitals, schools, and shopping centers. "The provision of [window washing] services [in high rise buildings] where members of the public work, eat, or sleep is no less a community service than the provision of such services to individual households." *English*, 2008 WL 878456 at *13 (finding that the provision of pest control services to commercial entities serves the everyday needs of the community).

Third, CCS provides services at the end of the stream of distribution. It cleans windows; that service cannot be passed along to some unidentified end user other than the tenants of the buildings it serves. "In the case of a service establishment, the 'end of the distribution stream' has been described as 'providing a service with a distinct beginning and end.'" *Gatto*, 442 F. Supp. 2d at 541 (citation omitted). CCS satisfies this test – the window washing it provides plainly has a distinct beginning and end.

The fourth inquiry is whether CCS disposes of its window washing services in small quantities. Plaintiffs contend that CCS does not satisfy this characteristic of retail establishments, noting that CCS generally sells its services to high rises, which house numerous individual tenants, and that it sells over half of its window washing services to entities requiring window washing services on more than one building. Plaintiffs suggest that Defendants' sales are more akin to wholesale than retail. See 29 C.F.R. § 779.328(a) ("Quantities which are materially in excess of * * * the standard * * * quantity of goods which is recognized in an

13

industry as the subject of a retail sale * * * are generally regarded as wholesale and not retail quantities"); 29 C.F.R. § 779.327 ("A wholesale sale, of course, is not recognized as a retail sale").

The court in *English* rejected a similar argument in the context of a pest control company that sold most of its services to customers with multiple unit corporate accounts. The *English* court noted that 29 C.F.R. § 779.328 "dealt with the distinction [between retail and wholesale] as it related to the § 13(a)(2) exemption," an exemption that was "contingent on the size of the establishment and the types of transactions in which it engaged." 2008 WL 878456 at *14, *3. According to the *English* court, "[t]he retail/wholesale distinction does not serve the same purpose for the application of the § 7(i) exemption, which focuses on the employee's compensation rather than the employer's size or business plan," as it did for the § 13(a)(2) exemption. *Id.* at *14. The court concluded that "[s]o long as the employee meets the other elements of the § 7(i) exemption – he receives commissions and his total wages meet the statutory threshold – it makes little difference whether he performs his services as part of a bulk, discount arrangement with a thousand unit fast food chain or a single one-off sale to a homeowner." *Id.* The Court finds the *English* court's analysis persuasive. Therefore, the fact that CCS sells its services in quantities larger than would be demanded by an individual homeowner is not sufficient to establish that CCS is not a retail establishment.

Finally, it is undisputed that CCS does not engage in manufacturing. In sum, CCS meets the criteria set forth in § 779.318.

Plaintiffs submit several arguments for why they believe the Court nevertheless should conclude that CCS's sales are not recognized as retail in the window washing industry. The Court addresses each argument in turn below.

14

First, Plaintiffs contend that services related to the maintenance of loft and office buildings – which Plaintiffs contend include window washing services like those CCS provides – lack a retail concept. In support of that position, Plaintiffs point to § 779.317, which provides a partial list of establishments that the DOL has determined have no retail concept. Among the enumerated establishments are businesses engaged in the maintenance of loft buildings or office buildings, air-conditioning and heating systems contractors, elevator repair businesses, painting contractors, plumbing contractors, and roofing contractors. 29 C.F.R. § 779.317. Plaintiffs contend that, because CCS is engaged in the maintenance of office buildings, and provides services akin to those of the various listed contractors, it lacks a retail concept.

Some courts have refused to defer to § 779.317 where there is no discernable rational basis for the Secretary of Labor's determination that a particular type of business lacks a retail concept. See *Reich v. Cruises Only, Inc.*, 1997 WL 1507504, at *5 (M.D. Fla. June 5, 1997) (holding that travel agency specializing in cruise vacations possessed a retail concept despite the fact that § 779.317 lists travel agencies as lacking a retail concept, concluding that the regulation "appear[ed] to be arbitrary and without any rational basis explained in the regulation[]"); *Martin v. Refrigeration School, Inc.*, 968 F.2d 3, 7 at n.2 (9th Cir. 1992) (refusing to defer to § 779.317 on the ground that "the list does not appear to flow from any cohesive criteria for retail and non-retail establishments"); *Rachal v. Allen*, 376 F.2d 999, 1003 (5th Cir. 1967) (rejecting Secretary of Labor's position that a fixed base aeronautics operator's business has no retail concept merely because it is part of an industry – namely, the air transportation industry – that § 779.317 lists as lacking a retail concept).

Here, § 779.317 explicitly identifies the Supreme Court's decision in *Kirschbaum v. Walling*, 316 U.S. 517 (1942), as the basis for including businesses engaged in the maintenance

of office buildings on the list of establishments to which the retail concept does not apply. In *Kirschbaum*, the Supreme Court concluded that a company that owned and maintained a six-story loft building could not be considered a retail or service establishment for purposes of § 213(a)(2). 316 U.S. at 526. The Court reasoned that "[s]elling space in a loft building is not the equivalent of selling services to consumers, and, in any event, the 'greater part' of the 'servicing' done by the petitioners here is not in intrastate commerce." *Id.* The Court said nothing about whether the sale of building maintenance services could be considered retail. Therefore, *Kirschbaum* does not appear to provide support for the Secretary's inclusion of building maintenance enterprises on the list of businesses that lack a retail concept. Consequently, in light of the fact that CCS satisfies the criteria set forth in § 779.318, the Court declines to defer to § 779.317.

Nor does *Muldowney v. Seaberg Elevator Co.*, 39 F. Supp. 275 (E.D.N.Y. 1941), another case relied on by Plaintiffs, compel the conclusion that CCS's window washing business lacks a retail concept. In *Muldowney*, the defendant employer manufactured, installed, serviced, repaired, and maintained elevators. 39 F. Supp. at 277. The defendant argued that the service, maintenance, and repair portion of its business constituted a service establishment under § 213(a)(2). The court rejected the defendant's argument, finding that "[t]he business carried on by the defendant was one business," as evidenced by the fact that "the parts used in its servicing, maintenance and repairs were parts made for use in elevators whether under construction or being serviced, maintained or repaired," "[t]he factory of the defendant was the headquarters for those engaged in servicing, maintaining or repairing," and [e]ach employee engaged in servicing, maintaining and repairing, obtained supplies and parts at the factory." *Id.* at 281. In other words, because the manufacturing and servicing businesses were not separate, the defendant

could not be considered to run a retail or service establishment. Here, CCS's servicing business is not intertwined with a manufacturing business, and therefore *Muldowney* is inapposite.

Plaintiffs also argue that CCS's sales cannot be deemed retail sales because CCS obtains the majority of its sales through competitive bidding procedures. But Plaintiffs misapprehend the undisputed facts in advancing this argument. The DOL regulations provide that "[s]ales made pursuant to formal bid procedures, such as those utilized by the agencies of Federal, State, and local governments and oftentimes by commercial and industrial concerns involving the issuance by the buyer of a formal invitation to bid on certain merchandise or services for delivery in accordance with prescribed terms and specifications, are not recognized as retail sales." 29 C.F.R. § 779.328(d). The evidence in the summary judgment record establishes that CCS engages in formal bidding procedures like those described in § 779.328 in only 10% of its business. The majority of the time, CCS simply provides its customers with a proposal estimating the cost of the job. Such informal estimates are not formal bids, and do not prevent CCS from falling within the scope of the § 207(i) exemption. Based on the foregoing analysis, the Court concludes that at least 75% of CCS's sales are not for resale and are recognized as retail sales in the window washing industry.

### C. Whether Plaintiffs Were Compensated in the Form of Commissions

The parties also dispute whether Plaintiffs were compensated on a commission basis. Defendants maintain that Plaintiffs' compensation is commission-based, while Plaintiffs argue that they were paid on a job or piece rate basis. The statute does not define the term "commission," *Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 508 (7th Cir. 2007), and "the case law on the meaning of 'commission' under the retail commission exception is sparse," *Parker v. NutriSystem, Inc.*, 2009 WL 2358623, at *4 (E.D. Pa. July 30, 2009). In considering whether a system of compensation is a commission system within the meaning of the statute, the

Seventh Circuit has stated

> [t]he essence of a commission is that it bases compensation on sales, for example a percentage of the sales price, as when a real estate broker receives as his compensation a percentage of the price at which the property he brokers is sold. Although his income is likely to be influenced by the number of hours a week that he works, the relation is unlikely to be a regular one. In one week business may be slow; he may make no sales and thus have no income for that week. The next week business may pick up and by working overtime that week he may be able to make up the income he lost because of slack business the previous week. Over a year his hours of work may be similar to those of regular hourly employees. So if he had to be paid overtime, his annual income would be higher than theirs even though he hadn't worked more hours over the course of the year than they had. We take this to be the rationale for the commission exemption from the FLSA's overtime provision.

*Yi*, 480 F.3d at 508. In *Yi*, the Seventh Circuit noted that a commission can be based on the full price of the good or service sold or on only part of the price, for example, the price of the labor that goes into the good or service. *Id.* at 509-10.

In *Yi*, the defendant, a chain of auto repair shops, charged its customers as follows: it multiplied the number of hours normally required to complete a given type of repair (referred to as "booked hours") by a dollar figure to obtain the labor price of the repair. 480 F.3d at 509. The defendant then added the cost of materials to the labor price to calculate the final price. *Id.* A team of mechanics completed the job, and each member of the team was compensated based on the percentage of the job's booked hours he completed.[10] The Seventh Circuit concluded that the mechanics – who were paid "a percentage * * * of the labor component of the price of their service to the customer" – were paid by commission. *Id.*

---

[10] Specifically, "[e]ach member of the team keeps track of the hours he works on the job. When it's completed and the hours of the team members are added up, [the defendant] determines each member's compensation by multiplying (1) the number of booked hours for the job by (2) the ratio of the team member's actual hours worked to the total hours worked by the team, and then by (3) a wage, per booked (not actually worked) hour, based on the skill or quality of the individual team member." *Yi*, 480 F.3d at 509.

Other courts also have held that a commission-based system exists so long as employee compensation is linked to the price charged to the customer for the good or service sold. See *Parker v. NutriSystem, Inc.*, 2009 WL 2358623, at *8 (E.D. Pa. July 30, 2009) ("some amount of proportionality must exist between flat rates earned by workers and the prices paid by customers for the products sold"); *Wilks v. Pep Boys*, 2006 WL 2821700, at *17 n.7, *18 (M.D. Tenn. Sept. 26, 2006) (holding that employer must demonstrate some "correlation" or "proportionality" between compensation and "the charges passed on to customers, either for labor alone or for the overall task"); *Huntley v. Bonner's, Inc.*, 2003 WL 24133000, at *3 (W.D. Wash. Aug. 14, 2003) (noting "[t]he importance of having some correlation between the amount paid to an employee and the amount collected from the customer"). Similarly, the Wage and Hour Division of the DOL has indicated that a commission-based compensation system exists where employee compensation is "related to the value of the service performed." Dep't of Labor Op. Ltr., 2006 DOLWH LEXIS 28 (June 29, 2006) (noting that, by contrast, employees who are "paid without regard to the value of the service performed * * * are considered to be paid on a piece rate basis and not on the basis of commissions"); see also Department of Labor, Wage & Hour Division, *Field Operations Handbook* § 21h04(d) (July 12, 1990) (where employee is paid for each "flat rate" hour worked and the customer is charged based on the number of "flat-rate" hours assigned to a particular job, "Wage-Hour will not deny that such payments represent 'commissions on goods or services'" for purposes of Sec. 7(i)"). Therefore, CCS would be entitled to summary judgment if, when viewed in the light most favorable to Plaintiffs, the evidence and the reasonable inferences that may be drawn from the evidence establish the existence of a relationship between Plaintiffs' compensation and the value of the services that they rendered, such that no reasonable jury could return a verdict for Plaintiffs.[11]

---

[11] To the extent that Plaintiffs contend that, in order for a commission-based system to exist,

Defendants maintain that CCS's compensation system is comparable to the one at issue in *Yi*, and thus is commission-based.[12]  It is undisputed that CCS assigns each job a number of "points" (akin to the "booked hours" in *Yi*) based on the number of hours it estimates a job will take.  The parties further agree that each window washer is paid based on a portion of the points assigned to the job, depending on the number of window washers on the team.  CCS's COO, Charles Adkins, and a CCS foreman, Philip Kujawa, testified that CCS calculates the price of its window washing services by multiplying the number of points by a fixed rate, and adding the cost of any permits, equipment rentals, and other incidental expenses associated with the particular job.  Defendants contend, that, like the mechanics in *Yi*, CCS's window washers are paid "a percentage * * * of the labor component of the price of their service to the customer." *Yi*, 480 F.3d at 509.  In particular, according to Defendants, CCS pays its window washers approximately 48.5% of its annual net revenue (which is a proxy for the amount customers are charged for labor).

---

compensation must be a fixed percentage of the sales price that argument fails.  As the case law discussed above demonstrates, all that courts – including the Seventh Circuit – have required is that there be some relationship or correlation between compensation and the amount charged to customers (either for labor or overall).  Plaintiffs' suggestion that they cannot be found to be paid by commission because they are not engaged in sales also is unavailing.  The case law plainly indicates that the application of the retail commission exception does not turn on whether employees are engaged in sales. See *Mechmet,* 825 F.2d at 1175 (finding that banquet waiters, who were not engaged in sales, nevertheless earned "commissions" under § 207(i)); *Gieg v. DDR, Inc.*, 407 F.3d 1038, 1049 (9th Cir. 2005) ("By its terms, the § 207(i) exemption applies to 'any employee' of a retail or service establishment who meets the compensation requirements; the exemption is not limited to those employees who sell retail goods and services.").

[12] Plaintiffs' contention that the Seventh Circuit's holding in *Yi* is confined to the automotive industry is without merit.  While the *Yi* court noted that "[t]he system of compensation [at issue] is industry-wide, and of long standing," it did not base its conclusion on any unique characteristics of the automotive industry, or the compensation system's long-standing nature in that industry.  Rather, the court simply opined that the reason the DOL had never found the compensation system used in the automotive repair industry to be in violation of the FLSA likely was because the DOL had recognized "the character of [the industry's] compensation system * * * for what it is – a bona fide commission system." *Yi*, 480 F.3d at 510-11.  The Court can see no justification for finding that a similar compensation system is not a bona fide commission system merely because it is employed in another industry.

Plaintiffs vigorously dispute Defendants' contention that any correlation exists between the points credited to window washers and either the labor charges or the overall price passed on to a customer. In support of their view, Plaintiffs rely on evidence demonstrating that customers are rarely charged the exact fixed rate per point. Plaintiffs also offer a number of summaries that purport to demonstrate disparities between Defendants' claimed methodology (*i.e.*, charging a fixed rate per point) and the reality of what customers actually are charged. To give just one example, Plaintiffs highlight thirteen jobs completed between January 2008 and January 2009 for which CCS charged the customer the same fee for labor. Using Defendants' claimed methodology, each of those jobs should have been assigned the same number of points. In fact, however, each of the thirteen jobs was assigned a different number of points ranging from as many as four times the anticipated number of points under Defendants' methodology to as few as half of the anticipated points. Only one of the thirteen jobs was assigned the exact number of points that would have been expected in a mathematical application of Defendants' asserted methodology. According to Plaintiffs, these transactions undermine Defendants claim that a relationship exists between compensation and the price charged for labor, as is required to establish that Plaintiffs were paid commissions.

In response, Defendants concede that customers rarely are charged the exact fixed rate per point. They maintain that the price charged per point varies as a result of unpaid debts, competitive market pressures, customer relations, and human error. Defendants further note that CCS performs 20,000 to 25,000 transactions each year, and contend that Plaintiffs simply have manipulated the data by highlighting "small jobs that are inherently more sensitive to fluctuations and market influences on customer price." According to Defendants, the record evidence demonstrates that CCS uses a commission-based system because the evidence shows

that, *on average*, CCS charges customers approximately the fixed rate per point and pays its window washers approximately 48.5% of its net revenue per year.

A number of factors point in the direction of a conclusion that CCS employs a *bona fide* commission system. It is undisputed that Plaintiffs are not paid based on the number of clock hours they work. Rather, they are paid based on points such that, like the mechanics in *Yi*, "[t]he faster [a] team [of window washers] works, the more it earns per number of hours." 480 F.3d at 509. Thus, Plaintiffs' compensation is "decoupled from actual time worked," a characteristic the Seventh Circuit has identified as a hallmark of "how commissions work." *Id*. Moreover, when viewed from a macro level, the evidence appears to demonstrate a relationship between compensation and the price of labor to customers.

However, Plaintiffs have identified numerous transactions in which Defendants' appear not to have employed their claimed methodology for determining customer charges. In an effort to explain these disparities, Defendants cite unidentified "fluctuations and market influences" as well as "human error." The Court finds Defendants' vague and sweeping explanation to be unsatisfying and ultimately unconvincing based on the record compiled at the summary judgment stage of the case. If Defendants do in fact charge customers in the way that they claim – charging a fixed rate per point, and making adjustments where necessary on some principled basis that is not inconsistent with a commission-based scheme – then Plaintiffs may well be paid by commission. But viewing the evidence currently before it in the light most favorable to Plaintiffs and drawing all reasonable inferences in Plaintiffs' favor, the Court concludes that disputes of material fact exist regarding the existence of the requisite nexus between the number of points assigned to a job (a proxy for employee compensation) and net revenue (a proxy for the amount that customers are charged for labor).

In sum, Defendants met their initial burden of production in moving for summary judgment by submitting the Adkins and Kujawa affidavits describing the methodology CCS employs to determine customer charges. See *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). The burden then shifted to Plaintiffs to present specific evidence that would demonstrate a genuine and material issue for trial on the "commission" issue. Plaintiffs discharged that burden by pointing to evidence from CCS's own records demonstrating Defendants' apparent failure to employ the claimed methodology in numerous instances and thus calling into question whether CCS's compensation system truly is commission-based. Defendants' reply falls short in its attempt to explain away – using the evidence adduced at summary judgment – the apparent disparities identified by Plaintiffs. Accordingly, Defendants have failed to demonstrate the absence of a genuine issue of material fact and an entitlement to judgment as a matter of law.

Simply put, the deviations between the methodology that Defendants aver that they use to charge for Plaintiffs' labor and the actual charges billed to customers are too great, too frequent, and not sufficiently explained to justify a grant of summary judgment at this time, on this record. At trial, based on a fuller record, Defendants may be able to explain the apparent inconsistencies highlighted by Plaintiffs and convincingly demonstrate that their compensation system is commission-based. However, on the current record, a rational trier of fact could find for Plaintiffs, and Defendants therefore are not entitled to judgment as a matter of law.

**IV.** **Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment [60] is denied.

Dated: June 21, 2010                              _____

Robert M. Dow, Jr.
United States District Judge