**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RAMON ALVARADO, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 07 C 06361 |
| v. ) | |
| ) | Judge Edmond E. Chang |
| CORPORATE CLEANING SERVICE, INC., ) | |
| NEAL ZUCKER, and CHARLES ADKINS, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, twenty-four current and former employees of Defendant Corporate Cleaning Service, Inc., have filed this suit against Corporate Cleaning and two decision-making employees, Neal Zucker and Charles Adkins (all defendants will be referred to collectively as CCS), seeking overtime pay allegedly due them under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, and the Illinois Minimum Wage Law (IMWL), 820 ILCS 105/1 *et seq*. R. 121.[1] CCS argues that Plaintiffs are exempt from the overtime provisions because employees are compensated by commission; this is CCS's eleventh affirmative defense. R. 18 at 8.[2] CCS moved for

---

[1]Citation to the docket is "R." followed by the docket entry. Citations to the parties' rule 56.1 statement of facts are "PSOF" (for Plaintiffs), R. 150, and "DSOF" (for CCS's response to Plaintiff's statement), R. 157, followed by the paragraph number.

[2]The cited docket entry is CCS's answer and affirmative defenses to Plaintiffs' first amended complaint. Plaintiffs have filed an unanswered second amended complaint (R. 121), but because the second amended complaint did not change the relevant claims of the first amended complaint to which the "commission" exemption might be applicable, the parties agree that the Court can resolve this partial motion for summary judgment without requiring CCS to file an answer to the second amended complaint.

partial summary judgment based on the commission exemption, R.60, but that motion was denied by Judge Dow, who was previously assigned to this case. R. 113; *Alvarado v. Corporate Cleaning Services*, 719 F. Supp. 2d 935 (N.D. Ill. 2010).[3] Plaintiffs now file a motion for partial summary judgment on the same issue, arguing that the commission exemption does not apply. R. 147. Because there is a genuine issue of material fact regarding the commission exemption's applicability, the motion is denied.

## I.

The facts of the case were thoroughly discussed in Judge Dow's earlier opinion denying Defendants' summary-judgment motion, albeit from the standpoint of taking the facts in the light most favorable to Plaintiffs. R. 113. Here, the Court recites those facts relevant to the present motion. Plaintiffs are or were window cleaners for CCS. PSOF ¶ 2. A project to clean windows is worth a certain number of "points," which are assigned by CCS based upon the size, complexity, and estimated time to complete a project. *Id.* ¶ 16. The time to complete a project is determined by the number of windows to be washed. *Id.* ¶¶ 18-19. If one washer completes the job, the washer receives all of the points that job was worth; the points are allocated if there are multiple cleaners. *Id.* ¶¶ 23. A worker is compensated by multiplying points earned by the washer's union rate. *Id.* ¶ 17. Thus, each project is worth a fixed amount of compensation. Some jobs took Plaintiffs more time to complete than had been estimated. *Id.* ¶ 21. Sometimes, if the time it takes to complete a project exceeds the

---

[3]For the sake of continuity, this opinion will continue to cite to the docket entry (R. 113) and page number for Judge Dow's previous opinion.

number of points it is worth, CCS will increase the number of points it is worth to keep pay competitive. R. 157, DSOF ¶ 22. According to CCS, the client is billed by multiplying the number of points by a "fixed rate" and then making adjustments as circumstances may require. PSOF ¶ 32, DSOF ¶ 32.[4] Those adjustments include factors such as: cost of permits, equipment rentals, incidental expenses associated with a particular job, competitive market pressures, human error, and rounding. PSOF ¶ 34; DSOF ¶¶ 2, 11. With regard to employee compensation, CCS aims to allocate 48.5% of its net revenue to employee compensation, and was near that goal in 2005 through 2008. PSOF ¶ 35. CCS documents distributed to washers refer to the compensation plan as a "piece rate" plan, and does not use the word "commission." *Id.* ¶¶ 25-26, DSOF ¶¶ 25-26.

CCS moved for partial summary judgment, arguing that the compensation structure qualified as a commission system. R. 60. Although the FLSA requires that employees be paid 1½ times their hourly wage for every hour worked in excess of forty hours per workweek, 29 U.S.C. § 207(a)(1), Congress exempted certain employees from that overtime pay rule, including employees who meet all three of the following criteria: (1) work in a retail or service establishment; (2) are paid a wage that exceeds

---

[4]Some of the filings are under seal pursuant to a protective order, R. 24, because the amount CCS charges for its services is proprietary information. Accordingly, this opinion will not provide the actual amount CCS charges for its services. Instead, the opinion will refer to a "fixed rate." The parties occasionally refer to a "cost rate." R. 63, 30. The terms are used synonymously. To the extent a number is needed to illustrate a point, it will be strictly hypothetical.

1½ times the minimum wage; and (3) receive more than half of their compensation in the form of "commissions for goods or services." 29 U.S.C. § 207(i).[5]

In deciding CCS's motion, the Court held that CCS had established the first two elements for the exemption, namely, that Plaintiffs are paid a wage that exceeds 1½ times the minimum wage and are employed in a retail or service establishment. R. 113 at 8-17. But the Court held that there was a genuine issue as to whether Plaintiffs are paid a commission. *Id.* at 17-23. After reviewing the "sparse" law on the question, *id.* at 17, the Court ultimately concluded that "disputes of material fact exist regarding the existence of the requisite nexus between the number of points assigned to a job (a proxy for employee compensation) and net revenue (a proxy for the amount that customers are charged for labor)." *Id.* at 22. The Court noted that "[a] number of factors point in the direction of a conclusion that CCS employs a *bona fide* commission system," and that "from a macro level, the evidence appears to demonstrate a relationship between compensation and the price of labor to customers." R. 113, 22. But the Court also noted numerous transactions where CCS appeared not to have adhered to its claimed billing practice, and CCS's explanation for the outliers was not sufficient to justify summary judgment. *Id.* Now, Plaintiffs move for partial summary judgment on the *non*-applicability of the commission exemption.[6]

---

[5]Similarly, the IMWL exempts from its overtime provisions "[a]ny commissioned employee as described in [the FLSA exemption]." 820 ILCS 104/4a(2)(F).

[6]Ideally, because Plaintiffs believe that they are entitled to summary judgment on the commission exemption, Plaintiffs should have filed a cross-motion for summary judgment at the same time CCS filed its motion. After this case was reassigned, this Court permitted the filing of the motion because there had been no fixed deadline for filing such motions and

4

## II.

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment will be granted against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in

---

discovery was still ongoing.

support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

### III.

In light of the opinion denying CCS's motion for partial summary judgment, the only element of the commission exemption that is at issue is whether the employees receive more than half of their pay on a commission of goods or services. Neither the FLSA nor regulations define "commission." The Seventh Circuit did extensively discuss, however, the meaning of commission in *Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 508 (7th Cir. 2007). There need not be a rigid mathematical correlation between compensation and sales. *Id.* On the contrary, "the essence of a commission is that it *bases* compensation on sales," and decouples time worked from compensation. *Id.* (emphasis added). Judge Dow's opinion cited other courts that have found a commission without a strict correlation, so long as there is "some amount of proportionality" between compensation and sales. R. 113 at 19 (citing *Parker v. Nutrisystem*, 2009 WL 2358623, at *8 (E.D. Pa. 2009)). Therefore, Plaintiffs would be entitled to summary judgment if, when viewed in the light most favorable to CCS, the evidence and the reasonable inferences that may be drawn from the evidence do not establish that the compensation paid to Plaintiffs is based on, or has some amount of proportionality with, CCS's sales, such that no reasonable fact-finder could return a verdict for CCS.

Plaintiffs first argue that an analysis of CCS's work performed between 2004 and 2008 establishes that the washers' compensation is not a commission. Plaintiffs

use the words "proportional" and "linked," and Judge Dow's opinion used the words "nexus," "relationship," and "proportion." What the parties and Court are expressing is the idea that, if CCS's claims are true and the employees are compensated via a commission system, there should be some relationship between the amount customers are charged and the amount washers are compensated. That relationship would arise from the fact that both figures are determined based upon the points a project is worth. If CCS's arguments are accurate, that CCS does charge a fixed rate, then two projects that both cost $1,000 dollars would be expected to be roughly the same number of points. Similarly, dividing the amount charged for a project by the number of points allocated to that project should yield the same fixed rate across all of CCS projects. The numbers would not be exact, for various reasons, PSOF ¶ 34, but, if CCS does in fact pay via commission, there would be a noticeable trend in the numbers. Plaintiffs argue that fuller analysis of CCS's records that were not available for the original motion for partial summary judgment show that there is no trend, and that the "evidence in this case overwhelmingly establishes that Plaintiffs' compensation is *not* proportional, linked, and otherwise has *no* statistical relationship to [CCS's sales]." R. 151, 5-6

    The first data set Plaintiffs rely on divides the amount CCS charged customers by the number of points assigned to the project to determine how much customers are charged per point. *Id.* 7. If CCS's allegations are true, the price per point should trend toward the fixed rate. The data show that the price per point rarely works out to the exact fixed rate (although it notably does on some occasions), *id.,* but if one evaluates

7

the data with a 15% variation to either side of the fixed price, then anywhere from 50-57% of the transactions, depending on the year, fall within that range of the fixed rate. At least some of that variation can be explained due to CCS's rounding practices. For example, if the price of a service is calculated to be $215, then CCS will round up and charge the client $225. R. 158 ¶ 15. This practice alone will account for some of the skew in Plaintiffs' calculation. Moreover, rounding is just one of several explanations that CCS has provided that could also skew Plaintiffs' calculations. These other factors include: billing increases for inflation, a heightened price charged for construction jobs, and price adjustments downward to stay competitive. R. 158 ¶¶ 17-19. Additionally, it is difficult to evaluate the full weight of Plaintiffs' calculations because of its presentation. Plaintiffs have broken transactions in to five categories: (1) those transactions in which the price per point was almost exactly the fixed rate; (2) and (3) the price per point falls within 15% in either direction from the fixed rate; and (4) and (5) all the rest. It may be that the rest of the transactions fall slightly outside of that 15% range – which could still support CCS's position. Alternatively, the other transactions may be far off from the fixed rate – which would support Plaintiffs. Due to the limitations of the data, CCS's proffered explanations for variations, and the fact that there does appear to be a trend toward a fixed rate, a reasonable fact-finder could find for CCS.

Plaintiffs rely on a second data set to argue that there is not a sufficient relationship. R. 151 at 8. Plaintiffs analyzed seventy-eight different projects that all were billed at $1,600 dollars, and then plotted the number of points each project was

8

valued. *Id.* at 9. If CCS charges a fixed rate, those projects should trend toward being worth the same number of points. Again, as one would expect, few transactions are the *exact* number of points, but they do generally trend in line with one's expectations. Moreover, if a buffer of roughly 10% is permitted in either direction from the expected number of points, approximately 75% of the points fall within that range. This conclusion coupled with CCS's explanations noted above again prevent the entry of summary judgment.

Lastly, Plaintiffs note several instances where CCS charged various prices per point for the same customer. R. 151 at 10. As before, Plaintiffs' broad overview of the data makes it impossible to determine how extensive any variation is. For example, with reference to one client, Plaintiffs note that CCS charged 18 different price points in 2004, 17 different points in 2006, 21 different points in 2007 and 19 different points in 2008. R. 151 at 11; PSOF ¶ 43. But Plaintiffs do not provide a breakdown of percentages to show how often those various price points were used. Although there may be several different price points per year, those price points that vary greatly from the fixed rate may be rare occurrences. Indeed, a brief review of the voluminous records attached to Plaintiffs' Rule 56.1 statement show only a few transactions varied significantly from the fixed rate. R. 153-3. And CCS's explanations for price adjustments again may account for the variation. Moreover, some of the more extreme outliers showing a very expensive price per point charge may be explained by CCS's evidence showing that equipment costs were sometimes included in the prices used by Plaintiffs. DSOF ¶¶ 24-25. A review of the records shows that many of the highest

9

prices per point are found in those years in which CCS claims that those prices included equipment costs, and so the evidence is consistent with Plaintiffs' calculations. R. 153-3. As with the other data sets, this final set of data does not establish such a substantial variation from the fixed price to conclude that no reasonable fact-finder could return a verdict for CCS.

In tension with Plaintiffs' arguments is that, at a macro level, this case aligns well with the Seventh Circuit's holding in *Yi*, which found that a compensation system was a commission. 480 F.3d at 510. The defendant operated a chain of auto repair shops and used the following method to bill clients: first, the shop calculated the number of hours it normally takes to complete a certain repair, called "booked hours," and then multiplied booked hours by a set rate. *Id.* at 509. This figure comprised the 'labor' cost to the customer. *Id.* The material costs were added to the labor cost to form a total price. *Id.* When mechanics were completing the repairs, they kept track of their respective hours spent on the project, and were compensated a pro rata share of the labor the customer was charged. *Id. Yi* noted that "the faster the team works, the more it earns per number of hours . . . . That is how commissions work; they are decoupled from actual time worked." *Id.* According to the Seventh Circuit, that is the basic characteristic that typifies a commission. CCS's compensation system is arguably similar to the one in *Yi*. A window washer might finish a project in four hours, and another washer might complete the same project in five hours, but both workers would receive the same compensation despite their different time expenditures. The decoupling of time worked and compensation is at the heart of a commission system,

10

and it is arguably present here. To be sure, Plaintiffs' analysis of CCS's transactions highlights some variations that could undercut CCS's alleged compensation system, but CCS has provided a number of explanations for the variation. These competing arguments leave a question of fact that is appropriate for a trial.

As a final argument in support of their motion for summary judgment, Plaintiffs argue that the compensation system was never referred to as a "commission" in CCS documents and Plaintiffs also refer to CCS documents to argue that the compensation system is a "piece rate" system. R. 151 at 12-14. Piece work is not exempt from FLSA's overtime provision. 29 U.S.C. § 207(g). Plaintiffs argue that Plaintiffs' wages are only linked to the amount of time it takes to complete a job, relying on the fact that the number of points assigned to a project is directly related to the number of pieces or windows required to be washed and the amount of time to wash each piece. *Id*. But Plaintiffs' argument must fail in light of *Yi*. There, the "booked hours" were also determined based upon the normal amount of time it takes to complete the assigned repair, *Yi*, 480 F.3d at 509, but it was still held to be a commission system. CCS's pricing does not compel the conclusion that CCS uses piece rate compensation, because it arguably ultimately maintains the crucial characteristic of decoupling payment from time worked.

Plaintiffs point out that various forms of compensation documentation reference "piece rate" and never use the word "commission," and so the payment system must be piece rate. R. 151, 12. Plaintiffs have advanced no binding authority that would require such a formalistic conclusion. In contrast, *Yi* actually counsels against relying on form

over substance: "[a]bout all that is clear [when determining whether there is a commission compensation system,] is that the word [commission] need not be used for the exemption to be applicable." 480 F.3d at 508. Although CCS's failure to use the word "commission" or maintain a written commission plan[7] may influence the ultimate determination of a fact finder, it is not enough to now grant summary judgment.

## IV.

For the reasons stated above, Plaintiffs' motion for partial summary judgment is denied. The bench trial will start on June 13, 2011, as previously scheduled.

ENTERED:

*Edmond E. Chang*

Honorable Edmond E. Chang
United States District Judge

DATE: May 27, 2011

---

[7]Plaintiffs also argue, in a paragraph's worth of discussion, that federal regulations require those employers who use a commission system to keep some record of the compensation plan. Plaintiffs contend that CCS has not kept any record of this plan, and CCS does not dispute that. R. 155, Exh. 1 at 21. Although this too may weigh in the fact-finder's decision, it does not warrant summary judgment. *See also id.* at 22 n.13 (citing other circuit courts that have held that failure to maintain the plan required by federal regulation does not render the exemption inapplicable).