**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RAMON ALVARADO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 07 C 06361 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CORPORATE CLEANING SERVICE, INC., | ) | |
| NEAL ZUCKER, and CHARLES ADKINS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, twenty-four current and former employees of Defendant Corporate Cleaning Service, Inc., have filed this lawsuit against Corporate Cleaning and two decision-making employees, Neal Zucker and Charles Adkins (all defendants will be referred to collectively by Corporate Cleaning's acronym, CCS), seeking overtime pay allegedly due to them under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, and the Illinois Minimum Wage Law (IMWL), 820 ILCS 150/1 *et seq.* R. 121, Second Am. Compl.[1] CCS argues as its eleventh affirmative defense that Plaintiffs are exempt from the overtime provisions of both statutes because CCS compensates its employees by commission. R. 214, Answer at 10. Both parties moved for summary judgment on the commission-exemption issue [R. 60, R. 147], but the Court denied both motions [R. 113, R. 190].[2] So the Court held a three-day bench trial to make findings

---

[1]This Court has federal question jurisdiction over the FLSA claim, 28 U.S.C. § 1331, and supplemental jurisdiction over the IMWL claim, 28 U.S.C. § 1367.

[2]For the sake of continuity, this opinion will continue to cite to the docket entry and page number for these previous opinions. They are also available at *Alvarado v. Corp. Cleaning*

of fact on the commission-exemption's applicability. R. 208, R. 209, R. 210. The Court has carefully considered the testimony of the five witnesses who testified at trial, the deposition excerpts read into the record, the parties' trial exhibits, the parties' stipulation of uncontested facts, and the parties' post-trial briefs. Below, the Court makes findings of fact and conclusions of law as required under Federal Rule of Civil Procedure 52(a). Ultimately, the Court finds that Plaintiffs are compensated by commission and are thus exempt from both statutes' overtime provisions.

## I. Findings of Fact

## A. The Nature of CCS's Business

CCS has provided professional interior and exterior window-washing services to commercial and residential customers in the Chicago area since 1994. R. 196, Schedule A, Stipulation of All Uncontested Facts (SF) ¶ 1. CCS is very successful; it is the largest window-washing company in Chicago and employs approximately 100 window washers. Tr.[3] at 74, 181, 220, 222. Generally, the company has more window-washing jobs than it has window washers to perform the work. *Id.* at 78. CCS performs window-washing services primarily for high-rise buildings, which it classifies as any building that is three stories or more. *Id.* at 181; SF ¶ 2. The average building that CCS washes is thirty to forty stories tall. SF ¶ 3.

---

*Serv., Inc.*, 719 F. Supp. 2d 935 (N.D. Ill. 2010), and *Alvarado v. Corp. Cleaning Serv., Inc.*, No. 07 C 06361, 2011 WL 2116089 (N.D. Ill. May 27, 2011).

[3]The trial transcript is available at R. 266 (pp. 1-107), R. 267 (pp. 108-242), R. 268 (pp. 243-301), R. 269 (pp. 302-414), R. 270 (pp. 415-78), and R. 271 (pp. 479-619).

CCS provides window-washing services year round. *Id.* ¶ 26; *see also* Tr. at 306. Window washers perform jobs at all times of the day, including during the late evening, night, and early morning. SF ¶ 27. But various factors cause the amount of available work to vary from day to day and seasonally. *See* Tr. at 305. For example, employees cannot wash windows in high winds, rain, or freezing temperatures. *Id.* at 85-86. As a result, window washers work more during the spring, summer, and fall and less during the winter. *Id.* at 74, 188, 306; SF ¶ 26. During the winter months when business is slow, many window washers return to Mexico to visit relatives. Tr. at 74. Then, in the spring, summer, and fall, window washers frequently request more work to make up for the slower winter months. *See id.* at 310. For example, Plaintiff Ramon Alvarado preferred to work ten to fourteen hours per day or more when weather conditions were good. *Id.* at 476. Numerous other factors affecting the availability of work include the presence of falcons (which attack window washers), the inability to gain access to a building, a customer's failure to remove screens or advise residents of a cleaning, and other work being done on the building. *Id.* at 189-90, 437.

Plaintiffs are or were employed as CCS window washers. SF ¶ 4. All CCS window washers, including Plaintiffs, are union members. *Id.* ¶ 5; Tr. at 235. They are fully licensed, insured, background-checked, drug-tested, and bonded. SF ¶ 5. CCS tests all window-washer applicants' ability to wash a ground-floor window as well as their ability to wash a building on their first day of work. Tr. at 23-24, 75. When hiring new window washers, CCS prioritizes hiring employees with window-washing experience. *Id.* at 74-75. The company will hire inexperienced window washers,

3

however, when a current CCS window washer vouches for a friend or family member and agrees to train the new employee. *Id.* at 75-76, 310. CCS has generally been unsuccessful at hiring additional window washers through advertising because most of the responses come from inexperienced workers. *Id.* at 77-78.

Window washers work off-site, without constant supervision. *Id.* at 153, 248-49, 486-87. The company has only 4 supervisors to oversee approximately 100 window washers working on up to 40 different crews on buildings throughout Chicago. *Id.* at 153, 248-49. Foreman Phillip Kujawa, for example, supervises 25-30 window washers and makes periodic stops at 6-10 jobs per day. *Id.* at 185. Kujawa knows when window washers have completed a job because they report back to him to be assigned more work. *Id.* at 187.

Window washing is dangerous. *Id.* at 180, 295. Safety rules govern almost all aspects of window washers' employment. *Id.* at 350-52; *see also* Defs.' Exh. 11; Pls.' Exhs. 64, 65, 66, 72 art. 15, 73 art. 15, 99. Window washers must be mentally sharp and physically strong. SF ¶ 28; *see* Tr. at 175, 178-80. Window washers not only face the risk of injuring or killing themselves, but also injuring or killing bystanders on the street below where they are working. Tr. at 172, 180, 296-97, 406-07, 419-20, 432-33. Because of these physical demands, fatigue is a job hazard. *Id.* at 180, 297.

Yet despite these potential safety issues, worker safety has not been a significant problem. First, no window washer has been killed on the job. *Id.* at 183, 296. Moreover, there is no evidence that worker fatigue has led to an increased number of

accidents. *Id.* at 79. And in the eight years before the bench trial, there were only two moderately serious workplace injuries. *Id.* at 296-97.

## B. CCS's "Point" System

CCS uses a "point"[4] system for calculating the labor component of customer charges as well as window-washer pay. Angela Berg, who began working at CCS in 2004, has calculated approximately 85% of CCS's customer bids since 2007, when she was promoted to the position of Operations Manager. *Id.* at 22-23, 30, 191-92. Berg learned how to prepare bids from Charles Adkins, CCS's Chief Operating Officer, Phillip Kujawa and Eloy Rodriguez, CCS foremen, and from receiving feedback from the window washers themselves. *Id.* at 24-25, 192.

Each time a customer contacts CCS requesting window-washing services for a new job, Berg typically prepares a bid using CCS's Bid Worksheet. Defs.' Exh. 1; SF ¶ 21; Tr. at 26-29, 30-31. CCS uses the worksheet to estimate the amount of time it will take window washers to complete a job. SF ¶ 21. The company examines the number of floors that have windows that need to be washed, the number of windows a window washer can wash on each floor on each drop (a descent from the top of the building to the bottom), and the number of minutes it will take to clean each window per drop. *Id.*; Defs.' Exh. 1; Tr. at 26-27. CCS then multiples these three numbers, and the product represents the estimated amount of time it will take to complete one drop. SF ¶ 21; Tr.

---

[4]Before December 2007, CCS referred to "points" as "assigned hours." "Points" are essentially the same as "assigned hours"; the only difference is a change in terminology. SF at 1 n.1.

5

at 27. CCS also factors in the estimated amount of set-up time needed to get ready for each new drop, which is typically fifteen to twenty minutes. SF ¶ 21; Tr. at 27. CCS then multiplies the total amount of time it takes to complete each drop (including set-up time) by the number of drops; this number is the total amount of time CCS estimates it will take to complete one side of a building. SF ¶ 21.

CCS completes this analysis for each side of a building. *Id.* It then adds up the total amount and typically rounds up to the next multiple of four hours. *Id.* The rounded up total reflects the number of assigned hours, or "points," that CCS assigns to the job. *Id.* Finally, Berg also adds in a "cushion" of points beyond the actual time that she estimates the job will take. *See* Tr. at 29, 57; *see also id.* at 193-94, 213. For example, a window washer typically expects to get earn eight to ten points for six actual hours of work and ten to twelve points for eight actual hours of work. *Id.* at 33, 87, 194, 213. Although CCS does not use the worksheet to prepare bids for all jobs, it has used the same methodology since at least 2004. *Id.* at 30, 157; SF ¶ 22.

### C. CCS's Billing Practices

CCS derives the labor component of a job from the number of points assigned to the job. It calculates the net price for labor by multiplying the assigned points by a "fixed rate."[5] Tr. at 31, 195, 218-20, 321-22, 324-26. Although no document memorializes the fixed rate that CCS uses, it has used the same fixed rate as the

---

[5]Some of the filings in this lawsuit are under seal pursuant to a protective order [R. 24] because the amount CCS charges for its services is proprietary information. This opinion therefore will not provide the actual amount CCS charges for its services. Instead, the opinion will refer to a "fixed rate."

starting point for calculating all bids during the time relevant to this lawsuit. *Id.* at 30-31, 159, 195, 218-19, 321-22, 324-26, 356-57. In addition to the net price for labor, the company also charges customers for the costs of any permits, equipment rentals, and other incidental expenses associated with that particular job. SF ¶ 25. Before 2005-2006, the company may have included these additional expenses in the net price rather than itemizing them and listing them separately. *Id.*

Although CCS always uses this methodology as a starting point to calculate a bid, the company often makes minor adjustments to the final customer charge. As a result, the price per point per job does not always equal the fixed rate. First, the price of every task is rounded up or down to the nearest $25 increment. Tr. at 43-44. Because of competition and market pressure, CCS may also lower the final customer charge or the fixed rate before it proposes the price to the customer; to maintain customer relations, it might also make similar adjustments after the washers finish the work. *Id.* at 31-32, 44-46, 314-16. The price per point may also change when CCS renews contracts with existing customers, at which time the company strives for a fixed-percentage price increase (with automatic rounding to the next $5 increment) to cover increased costs for equipment, gas, management salaries, and union rates. *Id.* at 38, 46-47, 161. Next, CCS charges a higher fixed rate for nonstandard tasks and construction cleans (buildings at construction sites, which are harder to clean) to cover increased material costs. *Id.* at 34-35, 47-52. The price per point might also vary when CCS increases the points paid to window washers if there was a mistake in calculating the bid or a change in the cleaning method or actual work performed. *Id.* at 33-34, 36-

7

37, 52-53. Finally, CCS absorbs part of the labor costs for certain tasks, such as canopy assembly. *Id.* at 313-14. CCS executives could not describe or estimate the frequency at which jobs vary from the fixed rate for any of the above reasons. *Id.* at 122-25, 132-33, 159-62, 357-58.

### D. Window-Washer Compensation

CCS also uses the points assigned to a job to calculate window-washer pay. SF ¶ 6. First, CCS managers and supervisors assign window washers to work at specific buildings and give the window washers work tickets describing the work they should perform at the assigned buildings. *Id.* ¶¶ 15-16. The amount of points assigned to the building is written on the work ticket for each job. *Id.* ¶ 17; *see also* Pls.' Exh. 48. When the window washers complete the work, they write their names and the number of points they each received on the back of the work ticket, which they then return to the company. SF ¶ 17; *see also* Pls.' Exh. 48. If one window washer completes a job, that window washer receives all of the points for that job. SF ¶ 6. When multiple window washers complete a job, they generally allocate the assigned points equally among the window washers. *Id.* In most cases, the window washers independently decide how to allocate the assigned points. *Id.* ¶¶ 6, 17. This allocation determines how much each window washer is paid. *Id.* ¶ 17.

To compute an individual window washer's pay, CCS then multiplies the washer's allocated number of points by his union rate. *Id.* ¶ 7. From November 8, 2004, to January 1, 2007, the union rate for "A Card" window washers was $16.00 per point; from January 1, 2007, to December 31, 2007, it was $16.60 per point; and since

8

January 1, 2008, it has been $17.25 per point. *Id.* Window washers are generally able to finish a job in fewer hours than the number of points assigned to the job, *see* Tr. at 466-67, but occasionally jobs take more actual hours to complete than the number of assigned points, *see id.* at 198, 203-05, 433-34. In the end, Plaintiffs are paid based on the number of points assigned to a job, regardless of the amount of actual time it takes them to complete the job. *Id.* at 35-36, 331, 464-65; SF ¶ 10.

Window washers occasionally negotiate with CCS to increase the points assigned to jobs that take longer than expected. Tr. at 24-25, 33-34, 36-38, 52-53. If window washers request a minimal increase, CCS typically increases the points paid to the workers. *Id.* at 586-87. But if the washers request a substantial increase, CCS evaluates the job and reaches an agreement with the washers as to the number of points it will add. *See id.* at 599-600.

Plaintiffs' compensation was calculated based on this point system for most of the time relevant to the Second Amended Complaint [R. 121]. During December 2007 and the first part of 2008, however, several Plaintiffs received hourly compensation based on their union rate multiplied by the *actual* hours they reported working. SF ¶ 11. Overall, Plaintiffs' annual pay for 2007 ranged between $39,330 and $63,965. *Id.* ¶ 14. For example, Plaintiff Ramon Alvarado, who testified at trial, made $49,168 in 2005, $48,892 in 2006, and $53,617 in 2007. Defs.' Exh. 32.

CCS never provided window washers with any agreement or memorandum stating that CCS intended to compensate window washers by "commission," using that word. SF ¶ 17; Tr. at 345. CCS also has no documents describing the window-washer

9

compensation plan as a "commission." SF ¶ 18. Plaintiffs' earning statements have never contained the word "commission." *Id.* ¶ 20; *see* Tr. at 344. Instead, the documents that CCS distributed to window washers refer to the window washers' compensation plan as a "piece rate," "piecework," or "modified piece rate" system. *See, e.g.*, SF ¶ 19; Pls.' Exhs. 35, 70, 72 art. 6, 73 art. 6; Tr. at 89-90, 229, 249, 344. For example, the collective bargaining agreement between CCS and the workers' union states that window washers should be paid overtime, either on an hourly or a piecework basis, for any time worked over forty hours. Pls.' Exh. 73 arts. 5.1, 6.1. The union, however, has never attempted to enforce this provision against CCS. Tr. at 382-83. The agreement also allows Plaintiffs to bring grievances through the union about overtime and the pay rate for individual jobs. *See* Pls.' Exh. 73 art. 14. But Plaintiffs also have never filed a grievance with the union about overtime pay. Tr. at 308-09, 474.

## E. The Parties' Statistical Analysis

Both parties submitted voluminous statistical data and analysis supporting their arguments about window-washer pay. Both parties produced charts that show the frequency of transactions at various prices per point and the variance from the fixed rate. *See* Defs.' Exhs. 33-38, 41, 43; Pls.' Exhs. 112-18. The parties agree that for all transactions between 2004 and 2008, the mode—that is, the most commonly occurring price per point rounded to the nearest whole number—is the fixed rate minus $5. Defs.' Exh. 41; Pls.' Exh. 118; Tr. at 391, 541-42. The second most commonly occurring price per point is then the fixed rate. Defs.' Exh. 41; Pls.' Exh. 118. Indeed, the parties agree that the five most commonly occurring price points fall within $5 of

10

the fixed rate. *See* Defs.' Exh. 41; Pls.' Exh. 118; *see also* R. 223, Defs.' Br. at 17. And as the Court has previously noted, depending on the year, 50%-57% of the transactions fall within a 15% variation to either side of the fixed rate. R. 190 at 7-8.

CCS's data also shows that the company pays its window washers close to its stated goal of 48.5% of its net revenue per year. *See* Defs.' Exh. 31; *see also* Defs.' Br. at 11. In 2005, 45.95% of CCS's net revenue went to window-washer compensation. Defs.' Exh. 31. That figure was 46.19% in 2006, 47.67% in 2007, and 49.48% in 2008. *Id.*

Most notably, the parties disagreed about the method for calculating the mean (or average) price per point for the 2004 to 2008 time period. *Compare* Defs.' Br. at 18 n.17, *with* R. 227, Pls.' Resp. Br. at 14-15. CCS's Chief Operating Officer, Adkins, calculated a "mean" of $35.12 by dividing the total customer charges for labor ("net revenue") by the total points paid to window washers. *See* Defs.' Exh. 38; Tr. at 269-70, 371. In contrast, Cristina Calderon, Plaintiffs' witness, calculated a mean of $37.63 by using Excel's average function. *See* Pls.' Exh. 117; Tr. at 524-37. This function essentially added up all of the price-per-point values and divided that sum by the number of values. *See* Pls.' Resp. Br. at 14.

Next, although both parties calculated a standard deviation of $13.75 for the 2004-to-2008 time period, *see* Defs.' Exh. 38; Pls.' Exh. 117, the percentage of transactions that falls within one standard deviation of the mean necessarily varies depending on whether Adkins's or Calderon's mean calculation is correct. Adkins determined that 87.7% of all the transactions fell within one standard deviation of the

11

mean, Defs.' Exh. 38, while Calderon calculated that 90.14% of transactions fell within that range, Pls.' Exh. 117; *see also* Tr. at 574-75. Ultimately, the Court finds that Plaintiffs' method of calculating a mean is correct and therefore that Plaintiffs' standard-deviation calculations are also correct (more on this later).

## II. Conclusions of Law

### A. Standard of Review

In this lawsuit, CCS bears the burden of proving that its window washers are covered by the FLSA's commission exemption. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974) ("[T]he application of an exemption under the [FLSA] is a matter of affirmative defense on which the employer has the burden of proof."); *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 571 (7th Cir. 2012) (citing *Corning Glass*). Although the FLSA requires that employees be paid 1½ times their hourly wage for every hour worked in excess of forty hours per workweek, 29 U.S.C. § 207(a)(1), Congress exempted certain employees who meet all three of the following criteria: (1) work in a retail or service establishment; (2) are paid a wage that exceeds 1½ times the minimum wage; and (3) receive more than half of their compensation in the form of "commissions on goods or services." 29 U.S.C. § 207(i).[6] In resolving CCS's motion for partial summary judgment [R. 60], the Court held that CCS had established the first two elements of the exemption: first, that Plaintiffs are employed in a retail or service establishment, and second, that their wages exceed 1½ times the minimum

---

[6]Similarly, the IMWL exempts from its overtime provisions "[a]ny commissioned employee as described in [the FLSA exemption]." 820 ILCS 105/4a(2)(F).

wage. R. 113 at 8-17. But the Court denied both parties' summary-judgment motions as to the third element of the exemption: whether CCS pays Plaintiffs by commission. *Id*. at 17-23; R. 190 at 12. Therefore, the third element remains the sole issue presently in front of the Court.

The FLSA exemptions, including the commission exemption at issue here, "are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *see also Schaefer-LaRose*, 679 F.3d at 571 (quoting *Arnold*). But the Seventh Circuit has recognized that this "principle of narrow interpretation of exemptions is a tie breaker." *Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 508 (7th Cir. 2007). In other words, only in a close case should the balance automatically tip away from the employer. *See Mechmet v. Four Seasons Hotel, Ltd.*, 825 F.2d 1173, 1177 (7th Cir. 1987) ("[G]eneralizations about interpretation, such as that exemptions from remedial statutes should be narrowly construed, are at best tie-breakers . . . ."). All in all, CCS must prove its entitlement to the exemption by a preponderance of the evidence. *See Yi*, 480 F.3d at 507-08.

### B. "Commission" vs. "Piece Rate"

Plaintiffs contend that CCS window washers are piece-rate workers, not employees paid by commission. *See* Pls.' Resp. Br. at 1-2, 5, 21, 23. This distinction is significant because employees paid by commission are exempt from the FLSA's overtime provision, while employees paid on a piece-rate basis are not. *Compare* 29

13

U.S.C. § 207(i), *with* 29 U.S.C. § 207(g). Indeed, there are several reasons why it is difficult to distinguish these two methods of compensation. For one, the FLSA defines neither "piece rate" nor "commission." *See Yi*, 480 F.3d at 508 (recognizing that the FLSA does not define "commission"). What's more, at the highest level of abstraction, the same event appears to trigger payments to employees under both systems: completion of the employee's assigned task. Drawing from the Seventh Circuit's examples in *Yi*, a quilt maker gets paid when the quilter completes a quilt, and a real estate broker is paid every time the broker sells a house. *See id.* at 510. Yet one is piecework and the other a commission.

But although the FLSA does not define "commission," the Seventh Circuit extensively discussed the meaning of the term in *Yi*. As *Yi* explained, "[t]he essence of a commission is that it bases compensation on sales" and "decouple[s] [worker pay] from actual time worked." *Id.* at 508, 509. In contrast, although a pieceworker's pay is also decoupled from actual time worked, a piece-rate system does *not* directly depend on sales. Again, consider a quilt maker. To provide more context, imagine that this quilter has a contract to supply quilts to a gift shop, and the shop will automatically pay the quilter each time the quilter provides the shop a quilt, regardless of whether a customer in turn buys that quilt from the shop. To be sure, over time, the shop might tell the quilter to make fewer quilts if customer demand decreases. But in the end, the quilter will still be paid for each quilt made, instead of being paid for each quilt sold by the gift shop. Thus, in general, the quilter can plan on working steadily from week to week, with only minor variations over the long term. This trend is characteristic of

14

a piece-rate pay system. *See id.* at 510; *see also Rutherford Food Corp. v. McComb*, 331 U.S. 722, 724-25 (1947) (describing the piece-rate work of slaughterhouse employees who earned a specified amount per hundredweight of meat that they boned); *United States v. Rosenwasser*, 323 U.S. 360, 361, 363-65 (1945) (discussing piece-rate garment workers).

In a commission-based system, on the other hand, a sale is a precondition for the worker getting paid. In the broker example, this feature is obvious: the broker gets paid only after the broker sells a house, and the broker's own work is directly a critical factor in whether the sale is completed. This feature may be less obvious in the case of automotive mechanics, as in *Yi*, or here with window washers because both sets of workers are one step removed from their companies' sales. The mechanics have no control over whether a sale is made; "sales depend on the flow of wounded cars into each of Sterling's local repair shops."*Yi*, 480 F.3d at 510. Likewise here, the window washers do not actually prepare bids or sign contracts with customers; they only wash windows. *See* SF ¶ 24. But in both situations, the mechanics and the window washers can count on compensation only when a sale is made. A mechanic needs a car to work on, and a window washer needs a window to wash. Similarly, if a quilter only produced custom-made quilts, the quilter would have to wait for a sale—a custom order—before the quilter could get started on a new quilting project. As with all commission-based pay, worker pay is directly dependent on the customers' decisions to purchase a company's product or service. And as a result, employees paid by commission "can't

15

count on working steadily the same amount of time week after week, because sales depend on buyers' decisions, which are unpredictable." *Yi*, 480 F.3d at 510.

Here, the abundance of window-washer work at CCS does tend to obscure that window-washer pay is still dependent on sales. *See* Tr. at 78 ("Normally we [CCS] have more work than we have window washers to fulfill that work."). But the only reason that there is a regular workflow is because CCS is such a big player in the industry and is extremely successful. *See id.* ("We are lucky enough to be always growing our business, so we are always busy."); *id.* at 113 (Berg's agreeing that CCS completed tens of thousands of jobs between 2004 to 2008), 181 (Kujawa's recognizing that CCS is the largest window-washing company in Chicago). Part of this success is based on the company's compensation system, which incentivizes window washers to work efficiently and, in turn, to increase the number of sales that CCS can make and complete. SF ¶ 8 ("By improving their skills, being more efficient, and working cooperatively in teams, window washers can earn more 'points.' The greater the number of 'points' a team earns the more compensation the team earns and the more revenue CCS receives."); Tr. at 220. Thus, window washers' work is still dependent on sales.

And here, customer decisions continue to impact window washers' work even after CCS makes a sale. First, customers can dictate certain times when window workers cannot work. Tr. at 126, 189-90, 514-15. Customers must also prepare for the window washers to do their work by notifying residents, removing window screens, and

giving washers access to the building. *Id*. at 189. When any of this is delayed, window washers are not able to work. *Id*.

And although seasonal variations in weather are not directly tied to customer preference, weather enters the sales equation because it delays the company in completing a sale and invoicing a customer. *Id*. at 188-89 (Kujawa's agreeing that weather is the biggest factor that prevents window washers from working). During winter months, for example, sales are slower because of cold temperatures and precipitation. SF ¶ 26; Tr. at 74, 188, 306. As a result, window washers may have to work more when the weather conditions are good to make up for weather-related delays. Tr. at 310, 476. This variability and unpredictability are characteristic of a commission-based system. *See Yi*, 480 F.3d at 510.

CCS has also demonstrated that its pay system exemplifies the second characteristic of a commission system: window-washer pay is decoupled from the actual time that window washers work. Both parties have admitted that window washers are paid based on the number of points they earn on a job rather than the number of actual hours they spend washing windows. SF ¶ 10 ("Plaintiffs are paid based on the number of points assigned to a job, regardless of the amount of time it takes to complete the job."); Tr. at 331 ("[P]oints did not and never did reflect in any way the actual hours that the individual worked."), 464-65 (Alvarado's admitting that he would earn the number of points assigned to a building no matter how much actual time it took to complete the building).

Indeed, CCS's point system is similar to the "booked hours" system in *Yi*, which the Seventh Circuit found to be a commission.480 F.3d at 510-11. In *Yi*, the defendant operated a chain of auto repair shops. *Id.* at 509. It calculated the number of hours it normally takes to complete a certain type of repair, called "booked hours," and then multiplied the booked hours by a set rate for that repair. *Id.* This figure was the labor portion of the customer charge. *Id.* The shop would then add the material costs to the labor price to come up with the total customer price for the job. *Id.* The shop compensated the team of mechanics who completed the repairs based on each mechanic's pro rata share of the booked hours assigned to the job. *Id.* In other words, the mechanics were paid based on "booked hours," not actual hours. As *Yi* noted, "the faster the team works, the more it earns per number of hours . . . . That is how commissions work; they are decoupled from actual time worked." *Id.*

CCS's point system is almost identical. CCS assigns any given window-cleaning job a certain number of points. SF ¶ 21. The number of points assigned is based on the building size, job complexity, and estimated time to complete a job. *See id.*; Tr. at 206. CCS then calculates the customer charge by multiplying the number of points by the "fixed rate," Tr. at 31, 195, 218-20, 321-22, 324-26, and then making adjustments as circumstances require, *see id.* at 31-38, 43-53, 161, 313-16. CCS then uses the point system to calculate window-washer pay. If one washer completes the job, that washer receives all of the points that the job is worth; if there are multiple washers, they allocate the points among themselves. SF ¶ 6. CCS then calculates worker pay by multiplying the points earned by the washer's union rate. *Id.* ¶ 7. Each job is worth a

18

fixed number of points, and compensation is therefore decoupled from the actual time it takes to complete the job. For example, a window washer might finish a job in six hours, but earn eight points. Tr. at 33, 194. Or one month, a window washer might finish a certain job in four hours, and the next time finish the same job in five hours. But the washer will still receive the same number of points for the job. In short, even though an estimate of the actual time it will take to complete a job is a factor in assigning points to a job, the pay the window washer receives is based on points, not actual hours. This decoupling of time worked and compensation earned is at the heart of a commission system.

What's more, contrary to Plaintiffs' argument that CCS did not have a plan for pricing jobs, *see* Pls.' Resp. Br. at 8-10, CCS has demonstrated that its point system is a bona fide commission plan. First, the parties' Stipulation of All Contested Facts describes how points are calculated for each job. SF ¶¶ 6-7, 10-11, 21-23, 25. Moreover, all three CCS executives provided consistent descriptions of the point system. *See* Tr. at 26-31, 191-94, 213, 218-19. And although Berg has only been calculating bids since 2007, she credibly testified that the company has been using the same methodology since 2004. *Id.* at 157. Alvarado also testified that he was paid under this point system the entire time he worked at CCS from 2001 to 2008, with the exception of the period in 2008 when he opted to be paid on an hourly basis. *Id.* at 398, 438; *see also* SF ¶ 11. Moreover, the work tickets that Plaintiffs submitted to CCS, dating back to before this lawsuit was filed, all reflect the number of points the job was worth, as well as the number of hours that a particular window washer claimed. *See* Pls.' Exh. 48. In short,

19

all of the evidence demonstrates that CCS has consistently used this point system in good faith to both calculate worker compensation and customer charges.

Finally, Plaintiffs point out that CCS never referred to its compensation system as a "commission," using that word, in CCS documents; instead, CCS documents label the system "piece rate" or "piecework." Pls.' Resp. Br. at 21-23; *see also* SF ¶ 19. For example, the collective bargaining agreement refers to the system as "piecework." Pls.' Exhs. 72 art. 6, 73 art. 6. CCS also provided Plaintiffs a document in which window washers could request to be paid on "piece rate." Pls.' Exh. 35. CCS agreed that there were no documents that identified the payment system as a commission. SF ¶¶ 17-18; Tr. at 345. But ultimately, the labels that CCS used to describe the window-washer compensation system has little evidentiary value. *See Yi*, 480 F.3d at 508 ("About all that is clear [when determining whether there is a commission compensation system] is that the word ["commission"] need not be used for the exemption be applicable."); *Mechmet*, 825 F.2d at 1177 ("We attach no weight to the fact that the collective bargaining agreement between the Ritz-Carlton and its waiters describes the waiters' income from the service charge as a 'gratuity' rather than as a 'commission.'"). Despite these labels, CCS has met its burden of proving that its window washers earn a commission.

## C. Statistical Analysis

Because CCS has met its burden primarily by relying on witness testimony, the parties' data and statistical analysis has minimal impact on the Court's conclusion that CCS pays its window washers a commission. Moreover, as *Yi* explained, there need not

be a rigid mathematical correlation between compensation and sales. *See* 480 F.3d at 508. On the contrary, a commission must only be based on sales. *See id*. In other words, there should be some relationship between the amount customers are charged and the amount washers are paid. But this relationship need not be mathematically precise, and it can vary based on the market and other pressures.

By demonstrating that there is considerable variation in the price per point that CCS charges customers, Plaintiffs generally try to undercut CCS's argument that it pays washers by commission. But CCS has credibly explained all of the variation. The first data set Plaintiffs rely on is a summary showing that the price per point works out to the *exact* fixed rate, with no allowance for even a penny variance in either direction, in 6%-11% of transactions, depending on the year. Pls.' Exh. 105; Tr. at 542-44, 557. Plaintiffs also offered a similar exhibit grouping all CCS transactions into five categories based on their percentage variation from the fixed rate. Pls.' Exh. 106. At least some of that variation is explained by CCS's rounding practices. *See* Tr. at 43-44; *see also* Defs.' Br. at 12. For example, if the price of a service is calculated to be $215, then CCS will round up to the nearest quarter and charge the client $225. This practice alone accounts for some of the skew in Plaintiffs' calculation. Moreover, rounding is just one of several explanations that could skew Plaintiffs' calculations. Other factors include billing increases for inflation during contract renewal, an increased price per point for construction and nonstandard jobs, and price adjustments downward to stay competitive. *See* Tr. at 31-32, 34-35, 38, 44-52, 161, 314-16; *see also* Defs.' Br. at 12-13. Finally, some of Plaintiffs' data did not account for the period of time when Plaintiffs

21

were paid on an hourly basis. Defs.' Br. at 13. As a result, the "points paid" on a task where some of the washers were paid hourly will appear lower than the assigned points actually used to calculate the customer charge. Defs.' Exh. 42; Tr. at 260-61, 279-85. CCS executives could not describe or estimate how frequently these various factors caused variations in the price per point. *See* Tr. at 124-25, 159-61. But their explanations credibly account for why Plaintiffs' data often do not equal the exact fixed rate for individual tasks.

Plaintiffs rely on a second data set to argue that there is an insufficient relationship between the net price of a job and the number of points assigned to that job. *See* Pls.' Exh. 107. Plaintiffs analyze seventy-nine different tasks that were all billed to the customer at a net price of $1,600, and then plot the number of points that each project was valued. Pls.' Exh. 107JJ (demonstrating that CCS paid fifteen different point values for tasks charged to customers at a net price of $1,600). Plaintiffs also analyze the variation of prices per point per customer from job-to-job. *See* Pls.' Exh. 108. Plaintiffs argue that this exhibit shows "[t]he disconnect between the hours paid to employees and the amount charged to customers." Pls.' Resp. Br. at 6. But in the end, both of these exhibits are not persuasive because they fail to distinguish between the different kinds of tasks that washers might perform for the same customer. Moreover, although few transactions are the exact number of points, they do generally trend in line with one's expectations. More importantly, CCS's credible explanations account for the variability.

Next, Plaintiffs introduced two rebuttal summaries at trial showing 186 tasks[7] where the points paid decreased but the net price charged to the customer increased or stayed the same. Pls.' Exhs. 119, 120. These 186 tasks represent only one half of 1% of the 35,861 tasks CCS performed from 2004 to 2008. Tr. at 269, 277. CCS sufficiently explained why there was this variation in this small percentage of jobs. *See* Defs.' Br. at 14-15. First, 32 of the tasks were performed, in part, by Plaintiffs who were paid hourly during the first half of 2008; therefore, the actual hours worked by the hourly-paid washers were not included in the "points paid" column in the summaries. Defs.' Exh. 42; Tr. at 260-61, 279-85. A little over a dozen tasks were for customers that were charged per drop, rather than by job, or reflected price changes after contract renewal and point restructuring. Tr. at 288-89 (Adkins's testifying about the Hancock Building and the Chicago Transit Authority). Then, of the remaining tasks, 77 tasks varied by less than 5 points. *Id.* at 290. Other explanations for the variation include a change in cleaning method, *id.* at 134-37, and washers' "banking" points (holding onto points for a later pay period when work is slow), forgetting to turn in work tickets, or failing to list all of their points, *id.* at 262, 289. In short, CCS has credibly explained those jobs where the points decreased but the net price increased or stayed the same.

Finally, the parties' disagreement about the correct method for calculating the mean (or average) price per point, discussed above in the Findings of Fact, does not ultimately impact the Court's ultimate conclusion that Plaintiffs receive a commission.

---

[7]The Court recognizes that these summaries do not include all instances where the same tasks were performed for the same customers. *See* Tr. at 144, 146.

*Compare* Defs.' Br. at 18 n.17, *with* Pls.' Resp. Br. at 14-15. CCS argues that Adkins and Calderon were simply calculating means for different values: Adkins was calculating the mean for the "price per point," while Calderon was calculating the mean for the "price per point per job." Defs.' Br. at 18 n.17. But this distinction is not significant. Although the Court finds that Calderon calculated the mean correctly, neither calculation is more informative than the other because the price per point may vary even in a commission-based compensation system. The average of those varying rates simply does not help determine whether employee pay is dependent on customer sales and is decoupled from actual time worked.

Plaintiffs also make much of the absence of CCS documents memorializing CCS's fixed rate. *See* Pls.' Resp. Br. at 4, 12-13. But CCS need not charge customers the same rate for every job (let alone provide documentation of those rates).[8] Although employees often receive a percentage of customer sales under a commission system, that percentage need not be set in stone. *Cf. Parker v. NutriSystem, Inc.*, 620 F.3d 274, 283 (3d Cir. 2010) ("[W]e decline to adopt a test that requires a commission, under § [207(i)], to be strictly based on a percentage of the end cost to the consumer."). Again, this conclusion is supported by the Seventh Circuit's analysis of the facts in *Yi*. In the

---

[8]It is true that CCS failed to follow the Department of Labor's regulations requiring employers to maintain certain documentation when they choose to pay their employees by commission. *See* SF ¶¶ 17-18; *see also* 29 C.F.R. § 516.16(a), (b). But this failure alone "does not in itself invalidate an otherwise applicable exemption." Dep't of Labor, Wage & Hour Div., *Field Operations Handbook* § 21h01 (July 12, 1990), *available at* R. 232-1, Defs.' Exh. A. Because Plaintiffs have not requested prospective enforcement of these record-keeping requirements, *see* Pls.' Resp. Br. at 22 n.8, the Court will leave enforcement to the Department of Labor.

example of how the mechanics were paid in *Yi*, the court noted that each mechanic may have a different booked-hour rate, depending on the mechanic's skill and quality of work. *See* 480 F.3d at 509. Moreover, during summary-judgment briefing, the parties in *Yi* stipulated that there were varying hourly rates for customer charges depending on the type of work the customer requested. *See Yi v. Sterling Collision Ctrs., Inc.*, No. 04 C 03138 (N.D. Ill. Dec. 7, 2005), R. 43 ¶¶ 40-41, *available at* R. 227-1, Pls.' Exh. B . As a result, depending on which mechanic was performing a task and what the task was, the percentage of the customer charge that accounted for employee compensation would always vary. In short, although a "percentage rate is implicit" in a commission system, *Yi*, 480 F.3d at 509, that rate may vary and need not be fixed.

The case law also supports the conclusion that other costs and variations in rate can be factored into the final customer charge and yet not undermine the finding that workers are paid a commission. For example, in *Yi*, the shop added a materials charge to the final customer bill. *Id.* at 509, 510. The mechanics, however, would not receive a pay increase based on this additional charge. *Id.* at 510. Likewise, in the 2006 opinion letter that CCS's counsel alluded to in opening arguments before this Court, *see* Tr. at 8-9, the Department of Labor explained that auto-repair employees were still paid a commission even when the shop provided customers a discount but did not change employees' pay rate, Dep't of Labor, Op. Letter No. FLSA2006-15NA (June 29, 2006), *available at* 2006 WL 4512957, at *1. Here, CCS varies the price per point charged to customers based on several factors, including competition, rounding, contract renewal, and the complexity of the job. *See, e.g.*, Tr. at 31-32, 33-35, 38, 44-52,

25

161, 314-16. CCS considers these factors independently from assigning points to the job. Thus, the assigned points continue to link employee compensation to the customer charge, even when the price per point might vary for any of the reasons CCS explained.

Ultimately, the parties' detailed statistical analysis was not relevant to the preliminary requirement for establishing a commission system: whether employee compensation is dependent on sales. And with respect to that requirement, the case law dictates that the payment method was a commission.

### D. Purposes of the FLSA

Thus far, the Court's analysis primarily has been to apply the standard articulated in *Yi*: workers earn a commission if their pay is dependent on sales and decoupled from actual time worked. 480 F.3d at 508, 509. *Yi*, however, also relied on the general purposes of the FLSA overtime provision to support its conclusion that the mechanics were paid a commission: "The purposes are to spread work in order to reduce unemployment, to discourage (by increasing the cost to the employer) a degree of overtime that might impair workers' health or safety, and to increase the welfare of low-paid workers." *Id.* at 510 (citing *Mechmet*, 825 F.2d at 1175-76). The parties also engage in argument about these purposes in their post-trial briefs, and the Court will therefore address them. In the end, though, these general policy arguments do not override the conclusion dictated by the legal standard discussed in the case law. The Court's conclusion remains that CCS pays its window washers by commission.

First, it is unlikely that requiring CCS to pay its window washers overtime pay would reduce unemployment. CCS's efforts to hire additional window washers through

advertising have largely been unsuccessful because mostly inexperienced workers respond. Tr. at 77-78. And CCS prioritizes hiring window washers with experience or who have a current CCS window washer vouching for them. *Id.* at 74-76. As a result, CCS generally has more window-washing jobs than qualified workers to perform them. *Id.* at 78.

There is also no evidence that paying window washers by commission (with no overtime compensation for time spent working over forty hours) jeopardizes worker health and safety. First, there is no evidence that a CCS window washer has ever been killed on the job. *Id.* at 183, 296. Angela Berg also testified that she was not aware of any accidents caused by worker fatigue. *Id.* at 79. Indeed, rather than revealing that workplace injuries were commonplace, the testimony about workplace accidents was merely anecdotal. *See id.* at 296-97 (Adkins testifying about two moderately severe workplace injuries that occurred in the last eight years). To be sure, window washing is physically demanding work, *see id.* at 179, and there is no doubt that washing windows would be dangerous if workers did not follow safety protocols, *see id.* at 350-52, 406-09. Nevertheless, because workplace safety issues appear to be more anecdotal rather than widespread, it is not clear that paying washers overtime would improve worker safety.

Finally, Plaintiffs are compensated well beyond minimum wage for their work. In 2007, Plaintiffs' annual pay ranged from $39,330 to $63,965. SF ¶ 14; *cf. Parker*, 620 F.3d at 284 (noting that employees who earned $40,000 to $80,000 per year "were not the lower-income type employees contemplated to be protected by the overtime

provisions"); *Yi*, 480 F.3d at 510 (noting that the mechanics earned more than $60,000 per year). There is also no credible evidence that the workers consistently work over 2,000 hours per year, which is the equivalent of a forty-hour workweek with two weeks of annual vacation. *See Yi*, 480 F.3d at 510 (considering whether the mechanics worked more than 2,000 hours per year). Although Alvarado testified that he regularly worked sixteen- or seventeen-hour days, *see* Tr. at 429, there are also several time sheets where Plaintiffs worked approximately eight hours a day or less, *see* Pls.' Exhs. 5, 6, 9, 12, 15, 16, 19, 22, 26-28, 32-33.

And as far as the evidence reveals, even if the window washers are working more than 2,000 hours per year, they are still making well above the minimum wage. Starting in mid-2007, the federal minimum wage was $5.85 per hour. SF ¶ 12. In 2008, it increased to $6.55. *Id.* In contrast, CCS window washers made between $16.00 and $17.25 per point during that same time period—nearly triple the minimum wage. *Id.* ¶ 7; *cf. Mechmet*, 825 F.2d at 1177 (noting that employees earning between $14 and $18 per hour were not "the marginal . . . workers for whom the overtime provisions were designed"). Their actual hourly rates would likely be even higher. *See* Tr. at 196 (Kujawa's agreeing that jobs generally take fewer hours than the points assigned to the jobs), 466-67 (Alvarado's giving examples of buildings assigned more points than the actual hours it took to complete the buildings).

In short, the purposes of the FLSA are not undermined by the conclusion that CCS's compensation system was based on commission.

### III. Conclusion

In conclusion, CCS has proven by a preponderance of the evidence that Plaintiffs are compensated on a commission basis and are thus exempt from the overtime provisions of both the FLSA and the IMWL. Judgment is entered for CCS and against Plaintiffs.

ENTERED:


     s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge


DATE: November 18, 2013